**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*p.h.v. to be sought*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Allison Watson (CA 328596)
awatson@bathaeedunne.com
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626

*Attorneys for Plaintiff and the
Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD PANTANO, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>VISA, INC., a Delaware corporation,<br><br>    Defendant. | Case No. 24-cv-7365<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

PARTIES ................................................................................................................................. 7

I.      PLAINTIFF .................................................................................................................. 7

II.     DEFENDANT ............................................................................................................... 7

DIVISIONAL ASSIGNMENT .............................................................................................. 8

FACTS .................................................................................................................................... 8

I.      DEBIT TRANSACTIONS ........................................................................................... 8

        A.      Overview of Debit Transactions ..................................................................... 8

        B.      Overview of Debit Networks ........................................................................ 13

                1.      History of PIN and Signature Networks and Visa's Dominance ...... 16

                2.      The Durbin Amendment ................................................................... 18

                3.      PIN, or Back-Of-Card, Networks Lack Scale and Meaningful Opportunities to Compete for Debit Transactions ....................................................... 19

                4.      Alternative Debit Networks ............................................................. 20

II.     VISA DOMINATES DEBIT TRANSACTIONS THROUGH EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT ........................................................................... 21

        A.      Visa Has Been the Largest and Most Powerful Debit Network Since the 1990s ........... 21

        B.      Visa's Web of Contracts Hinders Competition in the Debit Network Market ............... 22

                1.      Visa's Routing Agreements with Merchants and Acquirers Unlawfully Inhibit Competition and Stifle Innovation ...................................................... 23

                2.      Visa's Contracts with Issuers to Limit Enablement Unlawfully Restrict the Growth of Its Competitors ................................................................................. 27

                3.      Visa's Response to Regulation Has Successfully Protected Its Monopoly from Competition ......................................................................................... 29

                4.      Visa Uses Its Monopoly Power to Prevent Its Rivals From Achieving Sufficient Scale to Compete .................................................................................... 30

        C.      Visa Uses Its Monopoly Power to Prevent Innovation and New Entrants in the Debit Network Markets .......................................................................................... 32

                1.      Visa Fears that Fintech Debit Networks Could Disrupt Its Monopoly in the Lucrative Debit Network Market ...................................................................... 34

                2.      Visa Leveraged Its Debit Network Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets ................................ 35

                3.      Visa Pays Its Potential Debit Network Competitors, Including Apple, to Not Create or Promote Competitive Products ..................................................... 38

III.    THE RELEVANT UNITED STATES DEBIT NETWORK SERVICES MARKETS ............. 39

        A.      The General Purpose Debit Network Services Market Is A Relevant Product Market ... 40

i

      B.     The General Purpose Card-Not-Present Debit Network Services Market Is A Relevant Product Market ........................................................................... 44

      C.     The United States Is a Relevant Geographic Market ........................... 46

IV.    VISA HAS MONOPOLY POWER IN THE RELEVANT UNITED STATES DEBIT NETWORK SERVICES MARKETS ........................................................ 46

V.     THE DEBIT NETWORK BARRIER TO ENTRY ........................................ 49

VI.    ANTICOMPETITIVE EFFECTS ................................................................ 50

VII.   NO COUNTERVAILING FACTORS ........................................................ 52

CLASS ACTION ALLEGATIONS .......................................................................... 52

REALLEGATION AND INCORPORATION BY REFERENCE ............................ 55

PRAYER FOR RELIEF ........................................................................................... 59

JURY DEMAND ...................................................................................................... 60

**INTRODUCTION**

1.     Americans use their debit cards billions of times every year to buy more than $4 trillion worth of goods and services from merchants, including necessities such as groceries and clothing. Millions of Americans, including many lower-income consumers who lack easy access to credit, use debit cards to pay for purchases directly from their bank account. While Americans rely on debit transactions for necessities, most are unaware of the debit networks that allow those transactions to take place. Nor are they aware that just one company, Visa, has monopolized the market for debit network transactions; penalized industry participants that seek to use alternative debit networks; and paid off potential innovators and new entrants to the market to forestall or snuff out threats to its dominance in the debit network market.

2.     Debit cards comprise an increasingly large percentage of transactions between consumers and merchants.[1] Consumers use their cards for purchases at brick-and-mortar stores (card-present or CP transactions) and online (card-not-present or CNP transactions).[2]

3.     For all of these debit transactions to work, the consumer's bank must connect to the merchant's bank. Because there are thousands of banks on both sides of the transaction, debit card issuers utilize a debit network to process transactions and ensure the bank on the consumer side can communicate with all of the banks on the merchant side.

4.     A debit network, at its most basic level, is the infrastructure that supports debit card payments. Debit networks transmit transaction data between the merchant's bank and the debit card issuer. There are a variety of debit networks, and each is supported by a debit card.

5.     Debit networks provide authentication and processing of the debit card payment. Debit networks can be set up to authorize debit card transactions in one of several different ways: with PIN entry, which can only be done in CP transactions; with the cardholder's signature; or with the so-called PINless methods, necessary for CNP transactions.

---

[1] https://bankingjournal.aba.com/2024/08/survey-debit-card-use-grew-in-2023/#:~:text=Debit%20card%20active%20rates—the,the%20most%20popular%20digital%20wallet.
[2] https://stripe.com/resources/more/what-are-card-not-present-transactions

6. For a debit network to process a transaction, both the bank issuing the debit card to the consumer (the issuing bank or issuer) and the merchant's bank (the acquiring bank or acquirer) must be part of the debit network being utilized for the transaction. Issuers decide which networks to place their debit cards on, while merchants decide which networks they will accept and which they will choose to use for a given transaction. A network can compete for a transaction only if it connects to both the issuer and the acquirer.

7. The structure of the debit network market, where a successful network requires many issuers and acquirers to accept the network, creates a "a chicken-and-egg problem." This is because issuers are unlikely to join the debit network unless many merchants already use the network. And merchants are unlikely to join the network unless their customers have cards that work with the network, which requires the issuer to have activated the network. Building a network which is able to simultaneously come to scale on both the issuer and acquirer side is a daunting task. This creates a powerful barrier to entry called the Debit Network Barrier to Entry ("DNBE").

8. The DNBE has resulted in Visa's dominance in the debit network market. Visa owns and controls a debit network called Interlink that connects consumers' banks to merchants' banks which has been the largest in the United States for decades. More than 60% of debit transactions in the United States run on Visa's debit network, and its share of CNP debit transactions exceeds 65%. This market share allows it to charge over $7 billion in fees each year for processing those transactions. Visa's debit network is core to its North American business, where it enjoys operating margins of 83%. It earned more in revenue from its U.S. debit business than its credit business in 2022.

9. Mastercard, which owns a debit network called Maestro, is a distant second, processing less than 25% of all U.S. debit transactions and CNP transactions. Other networks, known as "PIN networks" because they originally facilitated ATM transactions for which accountholders needed to enter a PIN, are significantly smaller than Visa and Mastercard.

10. Visa's dominance in the debit network market and the strength of the DNBE are no accident. Coming out of the Great Recession, Visa identified two significant threats to its monopoly and the DNBE—from legislation and emerging technologies. Visa took steps to counter both threats, strengthening the DNBE in the process and increasing its monopoly power.

2

11.     The first threat to Visa's monopoly came in 2010 when Congress passed the Durbin Amendment, which became law as part of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010). The Durbin Amendment requires issuers to include at least two debit networks on every debit card—one on the front of the card and at least one on the back of the card—that are not affiliated with each other. These are known as the front-of-card and back-of-card networks, respectively. The intent of the requirement was to help promote competition in the debit network market by providing more merchant choice for routing debit transactions.

12.     The Durbin Amendment created a threat to the DNBE and Visa's position in the market. Specifically, if banks connected more cards to rival debit networks, there was the possibility that at some point, smaller rival debit networks would gain the scale they need to compete with Visa, which would cause Visa to lose volume, and importantly, fees. This is not conjecture. In 2012, after the Durbin Amendment became effective, Visa lost volume to other debit networks that offered lower fees. If this trend continued, Visa likely would have lost its dominant position and the DNBE would have substantially weakened. Visa, seeing this threat, used its dominant position in the debit network market to anticompetitively reduce competition and strengthen the DNBE.

13.     One way Visa was able to maintain its dominant position is by leveraging non-contestable transactions. When either an issuer or the acquirer doesn't accept the Visa-alternative debit network, Visa is the only option for processing the transaction which is referred to as a "non-contestable" transaction. More than 45% of debit transactions are non-contestable and have to use Visa. On these transactions, Visa has a 100% monopoly and sets an exorbitant "rack rate" on them. For these non-contestable transactions, Visa does not face meaningful competitive constraints. At the same time, these non-contestable transactions are necessary and valuable to the merchants which gives Visa significant leverage. Merchants can pay a lower price only if they agree to route all or nearly all their debit transactions, both contestable and non-contestable to Visa.

14.     For contestable transactions (those where Visa is not the only processing option), merchants are able to choose between Visa and alternative debit networks enabled by the issuer to process the transaction. In these transactions, competition theoretically should force debit networks to compete with one another, lowering fees and spurring innovation. However, Visa's significant volume of non-

contestable transactions gives it leverage over merchants and acquirers to subvert these competitive forces in contestable transactions.

15. Visa uses its control over non-contestable transactions to leverage routing deals that limit competition for contestable transactions. Without a routing agreement, the acquirer pays a rack rate on all transactions that are routed to Visa's debit network. Visa's rack rates for merchants who route too many of their transactions to competing debit networks is often punitive. Merchants who enter into a routing agreement with Visa receive a "discount" on all transactions, both non-contestable and contestable. Because other debit networks cannot compete for non-contestable transactions, and thus cannot compete on the rack rate for those transactions, as they often struggle to compete for any meaningful share of transactions involving a merchant who signed a routing agreement with Visa. If merchants do not accept a routing agreement, they will suffer from exorbitant rates on non-contestable transactions where they have no recourse but to accept Visa's rates.

16. These routing deals with large issuers and acquirers has allowed Visa to stabilize its volume since the Durbin Amendment went into effect. Visa's routing agreements cover more than 180 of its largest merchants and acquirers, which effectively shields at least 75% of Visa's debit network volume from competition. Practically, this means that Visa has insulated nearly half of total U.S. debit transaction volume from competition. Visa renewed many of its routing agreements in 2022, strengthening the DNBE for years to come.

17. Visa has also taken steps to insulate itself from competition from a second threat to its dominance: emerging technologies. Innovative technologies have the potential to develop new ways for consumers to make debit payments and undermine Visa's control of the debit network market. Several digital platforms such as Apple, PayPal, and Square which offer payment products to consumers, already have large existing networks that connect merchants and consumers. The payment products from these companies allow consumers to link their debit card credentials or bank accounts to a digital wallet or other payment products and make purchases in more convenient and efficient ways. Customers value the payment products offered by companies like Apple, PayPal, and Square.

18. These companies and their technology pose a threat to traditional debit networks as they already have the links between consumers and merchants for transactions. Should these platforms have a

4

desire to enter the debit network market or create payment products that cut out the "middleman" and provide payment solutions directly from consumers to merchants, they would undermine Visa's dominance.

19. Recognizing the threat these emerging technologies pose, Visa has employed a strategy of partnering with these potential market entrants before they enter the debit network market and disrupt Visa's dominance. Visa's partnership agreements with these potential competitors dissuade them from competing with Visa. For example, Visa offers lucrative incentives to potential competitors if they expressly agree that they will not develop a competing product or compete in ways that could threaten Visa's dominance. As Visa's CFO emphasized, "[E]veryone is a friend and a partner. Nobody is a competitor." These inducements benefit Visa though the hefty payments reduce Visa's immediate profits. The agreements reduce the risk that powerful would-be competitors, like Apple, develop innovative new technologies that could benefit consumers but would threaten Visa's monopoly profits in the debit network market. Visa employs its same carrot and stick playbook to emerging technologies as it does to the threats it faces from legislation. Should a potential competitor who has entered into an agreement with Visa develop a competing product, Visa has threatened to impose additional fees on these competitors. It uses this threat of fees as a stick to dissuade its potential competitors' innovation.

20. Visa's anticompetitive conduct harmed and continues to harm competition in the debit network market in at least three ways:

21. *First*, Visa exercises its monopoly power to raise barriers to entry and prevent rivals from achieving any degree of scale. It is capable of this because debit cards on Visa's debit network comprise a large portion of all U.S. debit cards and merchants must use Visa's network for a significant number of non-contestable transactions.

22. *Second*, Visa's conduct forecloses competition in the debit network market by subverting the competitive process. Debit networks can only grow and effectively compete if they have a significant scale on both the issuer and acquirer side of the debit network market. If a debit network lacks scale on one side of the market, it is difficult to grow on the other as well. Visa deprives rivals of the scale they need to compete effectively on both price and quality by entering into routing agreements with issuers and acquirers. This exacerbates other debit networks' scale problems on both sides of the market. Visa

represents at least 45% of all U.S. debit transactions and over 55% of CNP debit transactions while the non-Visa/Mastercard-owned networks collectively represent only about 11% of all debit transactions and only about 5% of CNP debit transactions

23.    *Third*, Visa also entered into express agreements with several large potential competitors, including Apple, PayPal, and Square, that they would not release products that could compete with Visa's debit network. These agreements have taken Visa's biggest competitive threats and the most likely new entrants to the debit network market, and defused these threats to the detriment of competition in the debit network market. These partnerships not only neutralized these would-be rivals but also greatly reduced Visa's own incentives to innovate, all at the expense of American consumers and merchants.

24.    Visa conduct anticompetitively eliminates competition in the debit network market by preventing its current and potential rivals from gaining the scale, market share, and data necessary to erode Visa's existing dominance.

25.    Visa's actions harm class members by depriving them of the benefits of a competitive debit network market. In contrast, Visa has succeeded in insulating itself from serious competitive threats so that it can now benefit from monopoly profits in the debit network market. Visa's supracompetitive prices, which it is able to charge because it faces no serious competition, are levied on merchants who in turn pass along these price increases to consumers. Even if merchants do not pass on the entire cost, they may offer consumers fewer products or products of a lower quality. Issuers who are subject to Visa fees pass them through to consumers in the form of higher prices and less services. Regardless of who pays Visa's supracompetitive prices in the short term, over the long run these costs are ultimately borne by consumers, merchants, and the broader economy.

26.    Visa maintains its monopoly in the debit network market by using anticompetitive means to insulate itself from competition. Visa uses its dominant position to penalize issuers and acquirers who switch to different debit networks as well as to incentivize companies that could develop alternative debit products to stay out of the market. It's carrot and stick approach to both threats demonstrate how Visa's playbook for using its dominance and position to limit the growth of existing competitors and to deter others from developing new and innovative alternatives to debit networks.

27.    Visa's monopoly allows it to collect a higher fraction of each debit transaction fee than it would in a competitive market. Visa's anticompetitive schemes to maintain its monopoly are largely invisible to consumers, in part because its debit transaction fees make up a relatively small fraction of each transaction, but total in the billions of dollars annually. These systematic efforts to maintain Visa's monopoly in the debit network market have resulted in significant additional fees imposed on American consumers and businesses and slowed innovation in the debit network market.

28.    Without intervention, Visa will continue to insulate itself from competition and subvert the competitive process in the debit network market. This crucial market fuels U.S. commerce and Visa continues to enrich itself at the expense of the American people who ultimately bear the brunt of Visa's unlawful monopoly and the lack of competition its conduct has created.

29.    Plaintiff is a Visa debit card holder who paid supracompetitive prices as a result of Visa's anticompetitive conduct and agreements. He seeks to recover for the overcharge caused by Visa's conduct and agreements, and also seeks injunctive relief to prevent Visa from continuing to restrain, distort, and overtly harm competition.

30.    Visa's conduct and agreements violate Sections 1 and 2 of the Sherman Antitrust Act, including because of Visa's *per se* unlawful agreements with Apple, PayPal and Square to forestall their entrance to the market. Moreover, Visa has conspired to monopolize the debit network market under Section 2 of the Sherman Act.

**PARTIES**

**I.    PLAINTIFF**

31.    Plaintiff Richard Pantano is a domiciled resident of Franklin, Massachusetts. Mr. Pantano has a TD Bank Visa debit card. Mr. Pantano was issued his current TD Bank Visa debit card approximately three years ago. Mr. Pantano typically makes purchases using his TD Bank Visa debit card a few times per month.

**II.    DEFENDANT**

32.    Defendant Visa Inc. ("Visa") is a Delaware corporation headquartered in Foster City, California.

33.     Visa is a global payments company that operates the largest debit network in the United States, routing 57.6 billion debit transactions worth $2.8 trillion in 2023. Visa provides a two-sided transactions platform that authorizes, clears, and settles debit transactions between businesses, consumers, and banks. Visa reported revenues of approximately $32.7 billion in fiscal year 2023, including $14 billion in the United States.

34.     Visa engages in, and its activities substantially affect, interstate trade and commerce. Visa provides services that are marketed, distributed, and offered throughout the United States, including across state lines and in this district. Visa's actions are ongoing and are likely to continue or recur, including through other practices with the same purpose or effect.

## JURISDICTION AND VENUE

35.     This action arises under Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2). Plaintiff and the proposed class seek damages and equitable relief, as well as reasonable attorneys' fees.

36.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

37.     Venue is appropriate in this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). Visa is headquartered in this district, transacts business within this district, and transacts its affairs and carries out interstate trade and commerce, in substantial part, in this district.

38.     The Court has personal jurisdiction over Defendant. Visa is subject to general jurisdiction in the state of California, where Visa is headquartered and undertakes commercial activities.

## DIVISIONAL ASSIGNMENT

39.     This is an antitrust class action for which "venue is proper in any courthouse in this District" under Gen. Order.

## FACTS

## I.     DEBIT TRANSACTIONS

### A.     Overview of Debit Transactions

40.     Debit transactions are a kind of financial transaction where funds are drawn directly from a consumer's bank account to pay a merchant for goods or services. This can be compared to a credit

transaction where customers pay using a line of credit issued by a bank. Consumers can use debit transactions in various ways, such as to buy goods at retailers or to pay bills online.

41. Debit cards and transactions have existed in the United States since the 1960s, when banks began to innovate ways for their customers to access funds in their bank accounts. Initially, debit cards issued by a consumer's bank could be used at automated teller machines ("ATMs") which allowed consumers to withdraw funds from their bank account. Over time, some retailers began to support purchases using debit cards. By the 1990s, as more merchants began accepting debit cards and consumers demanded more convenient alternatives to cash and checks, debit cards gained wider adoption. These factors led debit card usage to grow substantially in the United States.

42. Today, debit transactions are an important and popular payment method within the U.S. financial system. They are unique in that they immediately authorize the deduction of funds from a consumer's bank account unlike most other kinds of financial transactions. This feature offers consumers a way to purchase goods and services from merchants by drawing from funds that they currently have available in a bank account linked to a specific debit number. These are different from credit transactions in that credit transactions are not drawing from currently available funds, but rather from lines of credit issued by the card issuer.

43. Tens of millions of Americans prefer to use or must rely on debit to pay for purchases. Consumers who prefer debit include those who do not want to use credit cards; are unable to obtain credit cards; have limited credit available to them; prefer to avoid the lending dynamics of a credit card (e.g., the risk of debt accumulation, credit card fees, and charged interest); prefer the spending discipline of using only funds that are available in their bank account; and prefer the convenience of debit over cash and checks.

44. In the United States, the most consumers making debit purchases use a general purpose debit card issued by their banks. General purpose means that the debit card can be accepted at numerous, unrelated merchants.

45. A debit transaction starts when a consumer swipes, taps, or otherwise presents her debit credentials to a merchant as payment. First, the merchant, through a point-of-sale system, sends a request to its acquirer. The acquirer then sends the consumer's credentials and the transaction information to a

debit network (e.g., Visa) to process the transaction for authorization, clearing, and settlement. The debit network ensures all of the credential information is valid as part of that process and sends the validated data to the bank that issued the customer's debit card. The debit network requests authorization from the issuer to approve the transaction. The issuer will typically authorize the transaction if the consumer has a sufficient account balance to fund the transaction and there are no indications of fraud. If the transaction is authorized, the issuer places a hold on the consumer's funds and sends the authorization back over the debit network to the acquirer, minus the interchange fee (a fee paid by the acquirer to the issuer). In the final step, the acquirer transmits the authorization response to the merchant, allowing the merchant to complete the transaction. During this process, Visa collects network fees from the issuer and acquirer. It does so for each of the tens of billions of debit transactions that happen each year. For most transactions, this process happens in a matter of seconds, allowing debit cards to facilitate transactions between consumers and merchants efficiently.



**Figure 1**

46.     Debit networks impose a multitude of fees on issuers, acquirers, and merchants, including per transaction fees and fixed fees.

47.     Per-transaction fees are fees for every transaction run on the network. They include interchange fees, which are paid by an acquirer and deducted from what it transmits to the merchant. While debit networks determine the level of interchange fees, these fees primarily operate as a pass-

through. Thus, debit networks typically do not earn revenue from interchange fees. Rather, the debit network profits from usage of the network through charging network fees.

48.     Network fees are another type of per-transaction fee charged by debit networks to both issuers and acquirers. The fee varies based on the type of transaction, including whether it is a PIN or signature transaction and whether the transaction is card-present or card-not-present. In most cases, network fees are reflected in a network's contracts with acquirers and issuers, although in some cases networks will negotiate network fees directly with a merchant. A debit network such as Visa can exercise market power by raising network fees for merchants and acquirers alone, by raising network fees for issuers alone, or both. On average, acquirers, merchants, and issuers pay higher network fees to have debit transactions processed by signature debit networks like Visa than by PIN debit networks.

49.     For consumers, the payment process is more or less the same regardless of which debit network the transaction is sent from. However, depending upon what authentication method is used determines what kind of debit network processes the transaction and how much the merchant will pay in fees. For CP transactions, a customer will either be prompted to enter their PIN at the payment terminal or provide a signature instead. If a PIN is entered, the transaction is routed through a PIN network (or "back-of-card network") whereas if a customer signs for the purchase, the transaction is routed through a signature network (or "front-of-card network"). PINless debit transactions also are an option where a customer inserts their debit card into the card reader or terminal but is not prompted to enter their PIN number or provide a signature. PINless transactions can also be done in CNP transactions where the customer enters their credential information to authenticate a transaction. Theoretically, during this process, the merchant has a choice to use the front-of-card, signature network (which is Visa for approximately 70% of debit card payment volume) or a back-of-card, PIN network (many of which also can authenticate transactions PINless). But this choice is illusory and the merchant's routing decision often defaults to Visa due to Visa's exclusionary and anticompetitive conduct.

50.     There are slight differences in the mechanics of debit transactions depending on whether the debit card is physically present. Using debit card in person at a merchant is referred to as a card-present transaction. If a consumer uses a debit credential on a website, in an app, or over the phone, the transaction is referred to as a card-not-present transaction. Today, CNP transactions make up about half

of all debit spending and this number is growing. For CNP transactions, the accountholder either manually enters her debit credentials or relies on debit credentials stored in a digital wallet, such as Google Pay, Apple Pay, or PayPal. Unlike CP transactions, merchants can almost never prompt consumers to enter a PIN in CNP transactions. Instead, security features, such as multi-factor authentication, provide security for CNP transactions.

51.    Visa, like most other debit networks, does not issue debit cards to accountholders. Instead, it contracts with the consumer's bank (referred to as the issuing bank or issuer[3]) to issue debit cards and the merchants' banks (referred to as the acquiring bank or acquirer[4]) so that merchants can accept debit cards. Debit networks are the way that issuers connect with acquirers. A debit network's "rails" are the infrastructure and systems that facilitate these debit card transactions. Rails establish the rules, standards, and procedures for processing card transactions between cardholders, merchants, acquirers, and issuers. Different rails can have different costs, speeds, security, and reach. They enable easy and secure payment transactions.

52.    Debit networks sell a product that includes a debit credential or other account identifier unique to the consumer which can be accepted at merchants that participate in the network. This product includes payment guarantees for the merchant, the ability for a consumer or her bank to dispute and chargeback the transaction, fraud protections, and methods by which the merchants' and consumers' banks communicate between each other to facilitate the transaction and the transfer of funds.

53.    Debit networks themselves do not move money from consumers to merchants, the banks do. Nevertheless, debit networks play an important role in the process by clearing and overseeing this transfer of money which is called the interbank settlement process. The debit networks aggregate all transactions each day for each bank in their systems, net out fees, and provide the banks with daily

---

[3] The issuing bank may work with an issuer processor, which connects the issuer with the network and provides various services such as managing card issuance, authorizing or declining transaction, and communicating with settlement entities. For ease of reference, the use of the term issuer refers to both issuing banks and issuer processors.

[4] The acquiring bank may work with an acquirer processor, which sends transaction information to the network on behalf of the acquirer. For ease of reference, the use of the term acquirer refers to both acquiring banks and acquirer processors.

settlement reports. These settlement reports are used by the banks to transfer funds among themselves, typically using a wire service only available to banks.

54.    When a debit card is used online or in-person to make purchases, the point-of-sale system takes the information from the card – the debit credential – and transfers it to the debit network. As illustrated in Figure 1 below, debit card credentials includes: a 16-digit card number (known as the debit card number) that is usually found on the front of the debit card and other security features such as the expiration date, card verification value (CVV), an EMV security chip, and a four-digit PIN. The card will also graphically identify the "front-of-card" and may graphically identify the "back-of-card" networks. While debit cards may be enabled to process transactions over multiple networks, few include more than two unaffiliated networks.



**Figure 1**

B.    **Overview of Debit Networks**

55.    In the United States, debit cards typically must have at least two debit networks: a front-of-card network and at least one back-of-card network that is unaffiliated with the front-of-card network. Issuers select one front-of-card network and choose which back-of-card networks to enable. The front-of-card network's branding is typically displayed on the debit card (in addition to the issuer's branding). The branding of the back-of-card networks may or may not appear on the debit card. Consumers' debit networks are selected for them by their issuer.

13

56.     A debit network can only win transaction if the issuer places it on the debit card as either a front-of-card or back-of-card network. For debit networks which are on a particular card, each party to the transaction—the issuer, the acquirer, and the merchant—has to have enabled the debit network to process the particular transaction type or it will be ineligible to process that transaction. Therefore, to compete effectively a debit network needs sufficient scale on both the issuer and merchant sides of the debit market. The desirability and effectiveness of a debit network depends on the breadth of its acceptance and enablement by all participants to a transaction including issuers, acquirers, and merchants. If more issuers which place a particular debit network on a card means that there will be more consumers who may present the debit network for payment. This makes it more likely that merchants will want to accept the network (since it is one which their consumers use), and also more likely that issuer will want to use the network (because it is accepted by the merchants). This feedback loop is known as network effects. For Visa, this is not a problem: it is the default routing option when Visa is the front-of-card network. However, for smaller PIN networks and potential debit network market entrants, building scale on both sides of the market can be a nearly impossible given the high barriers to entry in the debit network market.

57.     There are four front-of-card networks. Visa is the dominant one with Mastercard coming in a distant second and Discover and American Express making up the remainder of the front-of-card networks. Issuers rarely change their front-of-card network due, in part, to significant switching costs, such as the costs of re-issuing new debit cards to accountholders. Also, Visa has secured long-term contracts with many issuers. For these long-term contracts, Mastercard, American Express, and Discover have little opportunity to displace Visa as the front-of-card network for those issuers.

58.     Signature or front-of-card networks are also often called 'dual-message' networks, because transactions are processed over their rails in distinct authorization events, and subsequent clearing/settlement events. The authorization is effectively an approval and guarantee from the issuing bank that they will honor the transaction, typically by placing a hold on the funds in the cardholder's account for the appropriate amount. This differs from PIN or back-of-card networks which are "single message"' because the authorization and clearing/settlement data are contained in one, single message when payments are processed over these networks.

59. Visa-branded debit cards, for which Visa is the front-of-card network, will often include Interlink, Visa's back-of-card network, and at least one additional back-of-card network that is not affiliated with Visa. Examples of such unaffiliated back-of-card networks include Mastercard's Maestro or a smaller debit network such as STAR, NYCE, or Pulse. Similarly, Mastercard-branded debit cards typically include Maestro and at least one additional back-of-card network that is unaffiliated with Mastercard.

60. Traditionally, the back-of-card networks required a customer to enter a PIN to verify transactions. This can be contrasted to the front-of-card networks which were traditionally signature networks and processed transactions with a signature.

61. Similarly to front-of-card networks, issuers also decide whether to enable the back-of-card networks to process particular debit transactions on the issuers' debit cards. For example, issuers may not enable back-of-card networks, for a CP transaction where a PIN was not entered. Despite their presence on many debit cards, PIN networks have been unable to gain a meaningful share of debit transactions, in part due to Visa's exclusionary and anticompetitive conduct.

62. Consumers do not pay debit networks directly to use their services. Instead, debit networks impose network fees on issuers and acquirers for every transaction. There are two types of acquirer fees: per-transaction fees and fixed fees. The acquirer pays a debit network a network fee for each transaction on its network. The amount of the network fee varies based on the type of transaction, i.e. a PIN transaction, CP, or CNP transaction. Starting in 2012, Visa also began charging acquirers a fixed monthly fee, known as the Fixed Acquirer Network Fee ("FANF"), based on factors like the number of locations the merchant operated and the merchant's volume of CNP transactions.

63. In addition, the acquirer also pays a per-transaction fee to the issuer—known as an interchange fee. This is a payment to the issuer for its services. For the largest issuing banks with $10 billion or more in assets, the interchange fee amount is capped by the Federal Reserve. For smaller issuers, the debit network sets the amount of the interchange fee.

64. Merchants ultimately pay at least some of the fees incurred by the acquirer as the acquirer will pass on these fees. The merchant also pays a fee to the acquirer for the acquirer's services. For most transactions, Visa's fees are significantly higher than those of the PIN networks.

15

### 1. History of PIN and Signature Networks and Visa's Dominance

65.     Beginning in the 1960s, the first debit networks in the United States started as automated teller machine ("ATM") networks. Banks issued ATM cards to accountholders so they could easily withdraw funds from their accounts. To use these cards, accountholders could enter a 4-digit number (known as the PIN) at an unattended ATM rather than approach the bank's counter to provide a signature.

66.     Merchants appreciated the elimination of checks and started installing PIN pads to enable more consumers to use ATM cards at the point of sale. Consumers also became more comfortable carrying a physical card for purchases. As ATM networks grew in popularity with merchants and consumers, there was increased enablement of these networks across the country of networks including STAR, NYCE, and Pulse, which evolved to become PIN networks.

67.     Later, Visa and Mastercard began to build their signature debit networks off of their dominant credit card infrastructure. As debit was emerging, Visa and Mastercard were joint ventures owned and controlled by their member banks, which comprised virtually all U.S. banks. Visa leveraged this scale to jump start its debit business.

68.     Visa launched the Visa Check Card, its point-of-sale debit product, in the 1990s and it was quickly able to scale among its member banks which issued debit cards with the Visa logo. Unlike PIN networks, which processed debit cards over rails designed for ATM networks, Visa processed consumers' debit purchases over its existing credit card rails. Further, Visa already had access to an existing base of merchants who accepted Visa credit cards. This gave Visa an easy way to roll out widely usable debit cards as merchants were already connected to Visa's rails whereas PIN networks needed to connect merchants to their rails. Especially helpful for Visa's growth was its network rules which initially mandated merchants accept both its credit and debit products.

69.     By working with issuers to add Visa's credit processing infrastructure to the issuers' installed base of ATM cards, Visa was able to quickly scale its debit offering. Because few merchants were willing to drop credit card acceptance, imposing this tying arrangement meant that Visa could assure itself of broad merchant acceptance for its signature debit network. It also meant that whenever a cardholder chose signature debit authentication, a merchant would have to pay the fees Visa dictated. This helped Visa obtain its debit network market monopoly.

70.     Visa used this power over merchants to put in place a pricing structure in which merchants paid high fees to financial institutions that issued Visa signature debit cards, which in turn created strong incentives for issuers to focus on encouraging cardholders to use Visa signature debit. Merchants challenged Visa's tying arrangement in an antitrust lawsuit that Visa eventually settled by paying billions of dollars. *In re Visa Check/MasterMoneyAntitrustLitig.*, 2003 WL 1712568 (E.D.N.Y. 2003).

71.     Around the same time that Visa was illegally ensuring that its signature debit network would become predominant in the United States, Visa and Mastercard prohibited their issuers from issuing branded-debit cards from competitor debit networks like American Express or Discover. This practice continued until the early 2000s and impaired the growth of these smaller networks. The rule ensured that Visa would dominate the large signature debit marketplace that it had illegally created. The Department of Justice challenged that Visa rule and it was found to violate the antitrust laws by the Second Circuit. *United States v. Visa and MasterCard*, 344 F.3d 229 (2d Cir. 2003). The court issued an injunction preventing the anticompetitive conduct, and shortly thereafter Visa and Mastercard settled private litigation regarding the same conduct and agreed to allow merchants to have the ability to accept their debit cards without accepting their credit cards, and vice versa. But Visa's dominance in the debit network market had already been cemented.

72.     In 1991, Visa had acquired Interlink, a PIN debit network. Then, beginning in the early 2000s, Visa negotiated agreements with numerous Visa debit card issuers that resulted in Interlink obtaining sole placement as a PIN debit network on a substantial number of Visa signature debit cards. Visa had no interest in having PIN debit replace signature debit, but Visa sought to limit competition for signature debit and ensure that debit network pricing remained high by gaining control of a greater share of PIN debit transactions. These agreements allowed Visa to neutralize attempts to avoid Visa's high signature debit network prices by switching to PIN debit networks. By ensuring that Visa was both the signature debit and PIN debit option on a debit card, merchants and acquirers would have to send their debit transactions to a Visa-controlled network. As a result of these agreements, Visa's share of debit network transactions grew further.

73.     Between 2006 and 2008, both Visa and Mastercard became independent public corporations, though banks continued to own significant stock in each of them. Even though banks were

able choose to issue a mix of debit cards featuring different networks, most banks chose to issue only Visa debit cards or only Mastercard debit cards, with the two competing with each other for front-of-card placement. It was challenging for Visa or Mastercard to displace the other as a bank's chosen front-of-card network, due to the expense and difficulty of issuing new cards to all accountholders. It was also rare for any network other than Visa or Mastercard to win front-of-card placement because of the large base of merchant acceptance. Other networks simply did not have the same scale of existing merchant relationships. Banks often chose to feature only one network—the front-of-card network—on debits cards they issued, meaning that merchants could not choose any network other than the front-of-card network for routing a particular transaction.

74.     Today, Visa is the largest debit card network in the United States. It eclipses its smaller rival Mastercard, which has not been able to gain significant share from Visa or restrain Visa's monopoly. Visa is the front-of-card network for over 70% of the debit card payment volume in the United States. Mastercard, by contrast, is the front-of-card network for around 25% of debit card payment volume, with American Express and Discover compromising the remainder of the debit card payment volume. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

**2.     The Durbin Amendment**

75.     In 2012, Congress passed the Durbin Amendment which required each debit card to support at least two unaffiliated networks. In other words, issuers had to enable at least one unaffiliated back-of-card debit network as a competitor to the front-of-card brand (i.e., Visa or Mastercard), somewhat improving routing choice for many merchants accepting debit. This ended issuers' practice of only featuring one network on debit cards they issued.

76.     The Amendment also set maximum limits on the interchange fees that merchants and acquirers pay regulated issuers (regulated issuers include those banks with more than $10 billion in assets) for debit transactions. It also imposed a no evasion-rule which limited a debit network's ability to provide incentives to issuers by paying them more than the interchange cap. By limiting incentives, Mastercard and other networks have an even more challenging time winning front-of-card placement where Visa is the current front-of-card network because they often cannot fully compensate an issuer for its switching costs.

77.     In 2023, the Federal Reserve clarified the Durbin Amendment in Regulation II by explaining that at least one network unaffiliated with the front-of-card network on each card must be enabled for CNP transactions.

78.     For Visa, this meant it could no longer mandate that Interlink be the lone back-of-card PIN network for Visa debit cards.

### 3.  PIN, or Back-Of-Card, Networks Lack Scale and Meaningful Opportunities to Compete for Debit Transactions

79.     PIN networks are much smaller than signature networks, like Visa and Mastercard, but they have continued to innovate. While still referred to as PIN networks, they have developed capabilities to process debit transactions without requiring a consumer to enter a PIN (referred to as PINless debit transactions). This PINless technology allows debit networks to process CNP transactions, such as online purchases, those using a digital wallet like Apple Pay, and in-person transactions in which the consumer does not enter a PIN.

80.     In a competitive market, these innovations would promote PIN networks growth. However, Visa has imposed contractual rules and terms on its merchant and acquirer agreements that require merchants to route the vast majority of their debit transactions to Visa, rather than back-of-card networks, which include the PIN networks. As a result of this conduct, and Visa's past anticompetitive conduct, none of the PIN networks has double-digit market share. Visa's dominance, its exclusionary rules, and the small size of the PIN networks mean that PIN networks compete for only a tiny fraction of all debit transactions. Visa's contracts with merchants and acquirers lock up volume, depriving rivals of scale and artificially limiting routing choices.

81.     This is compounded by the fact that some transactions must be routed to Visa and are not available to back-of-card competitors. These transactions, called non-contestable transactions, must be routed through Visa because back-of-card networks are not available for particular transaction types, such as transactions over a certain dollar amount or transactions that fail to meet particular encryption criteria. CP transactions may also be non-contestable if the issuer does not allow the network to process CP PINless transactions and the network's PIN option is unavailable because the merchant chooses not to prompt customers to enter a PIN.

82. Moreover, acquirers may not enable smaller PIN networks such as in the case where CNP transactions are tokenized. Tokenization is a process by which a cardholder's card credentials are turned into a different number which is shared with a merchant to process a transaction. This new number is used to authenticate the transaction so the merchant never has access to the cardholder's actual card information. In these cases, a transaction is effectively non-contestable because an encryption technology is used to facilitate some Visa network debit card transactions initiated online, in a mobile app, or with a digital wallet. In 2023, only a tiny fraction of CNP tokenized transactions were routed over a network's rails who was unaffiliated with Visa. Non-contestable transactions comprise a significant percentage of Visa debit network transactions. This is in part due to issuers historically not enabling CNP PINless transactions (sometimes times at Visa's prompting) deterring merchants and acquirers from enabling CNP PINless acceptance.

83. Because of these non-contestable transactions, merchants feel they must accept Visa or potentially lose a substantial number of sales and consumers. Because of the large number of consumers use debit cards on Visa's debit network, nearly all merchants and acquirers must accept Visa, which in turn requires nearly all merchants to route at least the non-contestable transactions to Visa instead less costly back-of-card networks.

### 4. Alternative Debit Networks

84. Alternative debit networks, developed by fintech firms ("fintech debit networks"), also exist to make a debit purchases, those these alternatives are not as popular as debit cards.

85. A fintech debit network can facilitate transactions by providing end-to-end functionality equivalent to traditional debit networks. It does so by authorizing a payment from a consumer's bank account, facilitates communications with the consumer's bank to authorize and clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. Alternative debit networks can complete this final transfer of funds using money transfer services available to banks, such as the Automated Clearing House ("ACH") or Real Time Payment ("RTP") networks, which are lower-cost alternatives to Visa's offering.

86. Visa recognizes the threats to its debit network from these innovations. By combining real-time money transfers with additional services—such as a credential that can be used at merchants

that are members of the network, payment guarantees, dispute capabilities, chargeback capability, and fraud protection—fintech debit networks provide equivalent functionality to debit networks like Visa's.

## II. VISA DOMINATES DEBIT TRANSACTIONS THROUGH EXCLUSIONARY AND ANTICOMPETITIVE CONDUCT

### A. Visa Has Been the Largest and Most Powerful Debit Network Since the 1990s

87. Visa is one of the most profitable companies in the United States, with global operating income of $21 billion and an operating margin of 64.43% in 2023. North America is among Visa's most profitable regions, with 2022 operating margins of 83%.

88. Visa's U.S. debit business is its largest source of revenue globally. Visa charges over $7 billion in network fees on U.S. debit volume annually, earning Visa $5.6 billion in net revenue. In 2022, Visa earned more revenue from its U.S. debit business than from its U.S. credit business, and more from its debit business in the United States than its debit business in any other region in the world.

89. Visa's incremental cost of each additional transaction on the Visa debit network is "approximately zero." Visa bears no financial risk for fraud on debit transactions over its network. If someone uses a stolen debit card or debit credential to make fraudulent purchases, the merchant or the issuer bears the financial risk—never Visa.

90. Visa's high share of the debit network market has barely moved in years despite regulatory changes such as the Durbin Amendment and innovations, including the rise of e-commerce, mobile payments, and other new technologies. Visa's debit network still carries over 60% of all debit transactions and 65% of all CNP debit transactions in the United States. Visa's dominance has allowed it to impose supracompetitive prices, stabilize prices, and depress price competition.

91. Visa is the front-of-card network for over 70% of the debit payment volume in the United States. It is nearly three times the size of Mastercard, its next biggest rival, which is the front-of-card network for approximately 25% of debit card payment volume. No other competitor has more than a single-digit share of the front-of-card debit network market. As Visa's former Head of Product North America has explained, Visa has "dominance on the front of card."

92. Visa charges issuers smaller fees than those it charges to acquirers. Issuers may avoid higher fees in exchange for taking actions that benefit Visa.

93.     Visa maintains its debit network monopoly both by preventing competitors from gaining the necessary scale to challenge Visa and by co-opting would-be competitors. Visa preserves its monopoly position against its smaller competitors by making it harder for them to develop scale on both sides of the debit network. For merchants and acquirers, Visa ensures it captures substantial volume with de facto exclusive deals that have the practical and economic effect of requiring exclusive routing for many transactions. For issuers, Visa pays incentives so that they will not take actions that would make it possible for merchants and acquirers to route to competitor PIN networks, such as by enacting rules preventing issuers from enabling PINless routing. If issuers enabled this on a broader scale, it would reduce Visa's leverage and make more transactions contestable by rival PIN networks. Should that occur, it could also lead to broader merchant enablement of PINless routing. For potential competitors, such as digital platforms that contract with Visa, Visa requires or induces them to agree not to introduce or support innovative alternatives to Visa's traditional card-based debit rails. The price of not signing a contract is high as Visa imposes onerous penalties. Those high penalties ensure that virtually all these merchants, acquirers, issuers, and digital platforms have no choice but to deal with Visa.

**B.     Visa's Web of Contracts Hinders Competition in the Debit Network Market**

94.     Visa's dominance in the debit network markets today is the result of a meticulous strategy to lock up volume and prevent competition at the point-of-sale. It is not the result of competition on the merits, but instead it is the result of deliberate efforts to anticompetitively maintain its market power. Visa's actions have effectively forestalled competition from smaller debit networks, thwarted government regulations which Visa saw as a threat to its dominance, and neutralized threats from potential competitions.

95.     As noted above, Visa saw the Durbin Amendment, which took effect in 2012, as a threat to its dominance and sought to hinder its effectiveness. The Durbin Amendment was passed as part of the Dodd-Frank financial reform legislation passed in 2010 in the midst of the aftermath of the Great Recession. The Amendment sought to facilitate competition in the markets for debit transactions that had historically limited consumer and merchant choice. It did so by requiring all debit cards to support at least two unaffiliated networks. In 2023, the Federal Reserve issued Regulation II which clarified the Durbin

Amendment and explained that at least one network unaffiliated with the front-of-card network on each card must be enabled for CNP transactions.

96.    Visa recognized in the years following the passage of the Durbin Amendment that it could be used to shift market share away from Visa. Visa responded to this threat by exploiting acquirers and issuers' dependence on Visa for certain transactions. Despite Congress's efforts to facilitate competition, Visa understood that because of the structure of the debit network markets, not all transactions could be routed to at least two unaffiliated networks. Thus, even with the Durbin Amendment's requirement for at least two unaffiliated networks on each debit card, Visa estimated that roughly 45% of Visa CP transactions were non-contestable. For CNP transactions, the numbers were even higher. For these non-contestable transactions, merchants and acquirers have only one option for routing a debit transaction: the front-of-card network, which on over 70% of debit card payment volume means Visa. These captive transactions give Visa the power to demand and enforce significant volume commitments.

97.    Visa employs two reenforcing approaches to obtain and enforce volume commitments. First, it shares its monopoly profits to buy exclusivity. Second, it charges punitively expensive rack rates (listed pricing for network fees and interchange), which are divorced from Visa's incremental costs, to merchants or acquirers that refuse to sign routing agreements and includes harsh penalties in its contracts with merchants and acquirers who do sign its agreements but fail to abide by the exclusivity requirements.

### 1.    Visa's Routing Agreements with Merchants and Acquirers Unlawfully Inhibit Competition and Stifle Innovation

98.    Visa has entered into agreements with many merchants that impose staggering financial penalties each year on them unless they route all or nearly all eligible debit transactions to Visa. Visa entered into these agreements to hinder PIN networks' ability to compete and to frustrate the Durbin Amendment's objectives. Visa ensures that most merchants who route more than a small percentage of eligible debit transactions to rival networks will face higher fees on non-contestable transactions.

99.    Visa has signed routing contracts both directly with many large merchants and with acquirers that control routing decisions. Visa pays for their loyalty and imposes harsh penalties if merchants and acquirers defect and use other networks. Visa structures these routing agreements in different ways. Sometimes, Visa contracts with merchants as a bid for a top position on the ranked list,

called the routing table, that determines which network a debit transaction should be routed to given the options available on the card used in the transaction. If a merchant does not commitment to granting Visa the number one position or other high placement on the routing table, Visa threatens to charge the merchant high rack rates on all transactions routed to Visa, including non-contestable transactions. This is effectively a cliff pricing structure, where a merchant who routes away from Visa is punished by the imposition of high rack rates. Dozens of merchants representing hundreds of billions of dollars of 2023 debit payment volume have signed contracts to route 100% of their eligible debit volume to Visa. Visa pays handsomely for these exclusivity contracts. For example, in 2023, Visa paid one large merchant over $20 million for this kind of agreement. While Visa's contracts with merchants and acquirers varying in terms of pricing, almost all of the routing agreements contain significant volume commitments.

100.     Visa structures its routing agreements and posted rack rates to artificially increase the cost merchants and acquirers face if they route transactions to a Visa competitor. In addition, in many routing contracts, if a merchant fails to comply with Visa's volume requirements, Visa is allowed to terminate the entire contract early and claw back incentives that Visa had previously paid the merchant as early termination fees. If Visa terminates the routing agreement, there may be impacts to all of the merchant or acquirer's Visa payments in both debit and credit transactions, as certain network fees in the agreements apply to both credit and debit transactions. Visa has also sometimes uses credit interchange discounts to win debit routing.

101.     Through these routing agreements, Visa artificially increases the cost merchants and acquirers face if they route transactions to a Visa competitor through this cliff pricing structure . Cliff pricing (sometimes called "all unit" pricing) grants the merchant or acquirer a lower price for every transaction they route to Visa so long as its total volume of transactions exceeds the committed threshold. If the merchant does not meet the commitment, Visa will impose its high rack rates on all transactions routed to Visa. Visa imposes this cliff pricing to discourage merchants from routing to Visa's competitors and therefore denying its rivals the ability to scale their businesses. Merchants and acquirers that enter a routing agreement with Visa stand to receive substantial network fee, interchange, and cash concessions, but only if they meet their volume commitments. However, if they fall short of these commitments, in some cases even by as one as small as 0.01% of a merchant's volume, Visa has the right to impose

significant monetary penalties on all the merchant or acquirer's Visa debit transactions (not just those transactions which fell short). The merchant or acquirer would experience each penalty imposed by Visa to be an additional cost of routing away from Visa.

102. Merchants and acquirers are willing to accept these effectively exclusive deals with Visa because they have a substantial number of debit transactions that they cannot route to any other network: non-contestable transactions. Practically, merchants and acquirers only have two choices: (1) agree to exclusivity with Visa; or (2) pay Visa's supracompetitive rack rates for non-contestable transactions and attempt to route contestable transactions to other debit networks. Visa's rack rates are frequently higher than PIN networks' rack rates. Yet if merchants want to secure better rates from Visa, they typically need to route all or almost all their Visa-eligible debit volume over Visa rails. Visa's volume commitments are typically significant, with a minimum threshold of 90–100% of the merchant or acquirer's Visa-eligible volume. Visa leverages merchants and acquirers' lack of choice for a debit network in non-contestable transactions to secure volume for contestable transactions at higher rates than it would be able to secure in a competitive market.

103. By way of example, consider a hypothetical grocery store has entered into a Visa routing agreement with a cliff pricing structure. During a typical day, the store has one hundred customers who present Visa-branded debit cards, all with the same back-of-card network. Fifty of those customers order online in CNP transactions and these may be contestable by the back-of-card network. The other fifty customers present Visa-branded debit cards in CP transactions. The issuer has not enabled their cards for CP PINless transactions on the back-of-card network and the customers do not enter a PIN when prompted to do so at the payment terminal. These fifty transactions are non-contestable and must be routed to Visa. Under its routing agreement, the merchant can avoid Visa's high rack rates on the fifty non-contestable transactions, only if it routes all one hundred transactions to Visa. Visa's rack rate for these transactions is $0.50 per transaction, but if the store hits its required volume (100 transactions) the reduced rate under its routing agreement is $0.25 per transaction. If the store opts to route all 100 transactions to Visa, the merchant will pay $25 in transaction fees. However, if it opts to only route the non-contestable transactions to Visa, and then use the back-of-card network for the remaining transaction,

then the store would pay $25 for the non-contestable transactions ($0.50 times 50 non-contestable transaction), in additional to PIN network fees paid on the 50 contested transactions.

104. This example illustrates how Visa's routing agreements make it so that a smaller PIN network could only compete for the fifty contestable transactions if it agreed to route the transactions for free, which compensates the merchant for the penalties incurred on the non-contestable transactions. This is because the price for contestable transactions increases dramatically in a "cliff" fashion if the target is not met and rack rates are imposed. PIN networks generally cannot route for free so the cliff pricing structure has the practical effect of forcing merchants into de facto exclusive dealing relationships with Visa for the vast majority of their volume of Visa-branded debit card transactions.

105. Because of this structure, some acquirers that also operate competing PIN networks have agreed to exclusive routing agreements with Visa. Visa has provided incentives in exchange for volume commitments from such acquirers and these payments disincentivize these rivals from using their own networks to vigorously compete.

106. Visa's routing agreements mean that PIN networks must do two things to win a meaningful volume of transactions away from Visa. First, they must offer a better per-transaction pricing than Visa. Second, and more importantly, the PIN network must compensate the merchant or acquirer for the penalty Visa will impose on non-contestable transactions. The volume of non-contestable transactions is generally larger than the set of transactions for which the PIN network can compete. This means that a PIN network may have to offer zero or negative per-transaction prices. Visa's penalties on merchants and acquirers on non-contestable transactions reflect significant and cost-prohibitive barriers to expansion for PIN networks.

107. Visa also sometimes increases its debit routing volume by pricing other products, such as credit, based on how much debit volume merchants or acquirers route to Visa. For example, Visa offered credit incentives, among other things, to win routing from Google and to protect against PINless enablement. Similarly, Visa offered credit incentives to win debit routing volume from a health food supermarket chain. Most PIN network competitors do not have credit businesses to incentivize merchants to increase their debit routing volume.

108. Visa also has a history of introducing new fees that it will then waive in exchange for exclusivity or near exclusivity. This increases the difficulty merchants face in routing transactions to different networks. For example, Visa introduced the FANF in 2012 in response to threats of increased competition once the Durbin Amendment went into effect. FANF changed the structure of Visa's merchant pricing by charging merchants through their acquirers a fixed monthly fee for accepting Visa debit transactions. Visa has raised FANF twice in subsequent years. Visa uses FANF as another lever to lock-up merchant debit volume.

### 2. Visa's Contracts with Issuers to Limit Enablement Unlawfully Restrict the Growth of Its Competitors

109. Issuers choose both the debit networks included on their cards and the number of debit networks to include. The Durbin Amendment requires that each debit card, including those on Visa's debit network, include at least one additional unaffiliated network. However, an issuer could choose to enable even more networks, thereby increasing the choices available to merchants and driving competition. Seeing this threat to its monopoly, Visa used its power to induce issuers to limit the enablement of rival networks on Visa-branded debit cards. For example, Visa's issuing contract with JPMorgan Chase made this requirement explicit. It provides that only one unaffiliated PIN network can be enabled on 90% of Chase-issued, Visa- branded debit cards. In 2023, Visa entered into an agreement with one of its largest fintech debit issuing customers that similarly limits enablement to a single non-Visa debit network for all debit cards issued through that fintech entity's partner issuing banks.

110. Visa's contracts with other issuers achieve a similar effect through a variety of different means. Visa has nearly 1,000 issuing contracts which strongly deter the issuer putting more unaffiliated debit networks on the back of the card. These contracts frequently contain volume requirements whereby the issuer must maintain its annual growth of Visa debit transactions in line with Visa's overall debit network growth in the United States. This helps ensure that Visa's share of the issuer's transactions does not decrease.

111. Visa's debit volume gives it the power to impose significant monetary penalties. Similarly to the routing agreements with acquirers and merchants, if an issuer does not meet the system growth

requirement it could be required to pay an early termination fee which is comprised of a percentage of the benefits it has earned plus a multimillion-dollar fixed fee.

112.    Visa's debit volume targets also incentivize issuers not to enable additional networks on their debit cards and not to enable existing networks for additional transaction types, like PINless routing. For example, a 2020 Visa issuing contract included a minimum volume requirement that was designed to "mitigate a shift to PINless, RTP [Real Time Payment], etc." Similarly, Visa "signed incremental debit incentive deals" with large issuers and which Visa thought would make them "unlikely to enable PINless on F2F [face-to-face] transactions." Smaller issuers also rely on their issuer processors to make network selections, and Visa also enters into agreements there that are designed to "[p]rotect and grow existing [payment volume] from small issuers and discourage PINless enablement."

113.    Visa's issuer contracts reinforce the protections created by Visa's merchant and acquirer routing contracts by creating artificial barriers to entry and expansion. These agreements also effectively expand or entrench the transaction volume that is non-contestable. Regardless of a merchant's preferred routing choice, there are many times where the debit networks enabled on a Visa-branded debit card cannot compete for a transaction because of Visa's web of agreements with merchants, issuers, and acquirers.

114.    Visa's volume requirements in issuing contracts have a cliff pricing structure much the same as their contracts with merchants and acquirers. If an issuer has any meaningful shortfall of the volume requirement, Visa has the right to impose significant monetary penalties across all Visa debit transactions (not just the marginal transactions). If the issuer does not achieve the agreed level of exclusivity in any given year and that failure is attributable to affirmative actions by the issuer, such as the enablement of additional PIN networks, then Visa has the right to apply significant monetary penalties or early termination penalties.

115.    Visa sometimes leverages discounts on other products, such as its Debit Processing Services ("DPS"), to win issuer routing volume, similar to how it leverages discounts on other products to win merchant routing volume. Visa has packaged card-brand issuance contracts with its DPS processing services to win business from large banks.

### 3. Visa's Response to Regulation Has Successfully Protected Its Monopoly from Competition

116. As discussed above, Visa feared that competition from PIN networks after the passage of the Durbin Amendment would erode its monopoly share of the debit network market. Initially, the Amendment had some success in allowing the smaller PIN networks to grow their market share. However, Visa quickly recovered and increased its high share in the years since the Durbin Amendment took effect.

117. Smaller networks have attempted to chip away at Visa's dominance in the years since the Durbin Amendment. In one such instance, Mastercard launched a PINless program for Maestro targeted at Visa-branded debit cards. Any gains from this program were short lived. Visa leveraged its tremendous scale and sheer volume of non-contestable transactions to penalize disloyal merchants, acquirers, and issuers. Visa, by its own recognition, continues to win despite PIN networks generally offering lower prices.

118. The Durbin Amendment did not exempt Visa, other debit networks, issuers, merchants, and acquirers from complying with the antitrust laws. Rather, the Dodd-Frank Act, 12 U.S.C. § 5303, which includes the Durbin Amendment, provides that the Act is complementary to the antitrust laws, including the Sherman Act, and that requirements imposed on companies are in addition to, not to the exclusion of, those provided by the antitrust laws.

119. In response to this new regulatory landscape, Visa engaged in a relentless strategy to lock up debit volume by capturing the entities that control routing decisions. As a result of its campaign, it has now entered de facto exclusive routing contracts with over 180 of its largest merchants and acquirers. These routing agreements cover over 75% of Visa's debit volume and result in the foreclosure of at least 45% of total U.S. debit volume. These agreements deny competitors the scale necessary to compete effectively, because issuers have a lower incentive to add networks to the debit cards they issue if merchants predominantly route to Visa.

120. Visa's contracts with issuers only serve to magnify this problem. Visa uses its contracts with issuers to incentivize the issuers to choose to not enable new transaction methods, which in turn

results in more non-contestable transactions than there would otherwise be, providing Visa with even more leverage over merchants and acquirers.

121. Visa deployed a similar response strategy in reaction to Regulation II, the Federal Reserve's October 2022 clarification of the rules implementing the Durbin Amendment. Visa did so by looking at ways to secure more volume under routing deals, target merchant and acquirer deals with early termination fees for longer, firm up commitments of routing volume as well as to renew issuing agreements. Visa took steps to ensure transaction volume was locked up before Regulation II went into effect.

### 4. Visa Uses Its Monopoly Power to Prevent Its Rivals From Achieving Sufficient Scale to Compete

122. In two-sided transaction markets like the debit network market, there are huge barriers to entry and expansion when a competitor, like Visa, achieves scale on both sides of their market. Visa's contracts on both sides of the debit network market, with issuers on one side and merchants and acquirers on the other, increase barriers to entry and expansion around it's the market and prevent other debit networks from gaining a meaningful share of the market. On the issuer side of the market, Visa incentivizes issuers to enable fewer networks and fewer routing options on non-Visa networks. Because fewer issuers enable Visa's PIN-network competitors and all their features, merchants and acquirers on the other side of the market are less likely to take the time and expense to enable routing to PIN networks.

123. Rival networks cannot grow to sufficient scale or improve their features due to Visa's chokehold on the industry. These competitors are caught in a feedback loop where they lack enough usage and acceptance on either side of the market to effectively compete with Visa. This network effects phenomenon results from the difficulty in building scale on both sides of a two-sided market.

124. Visa uses its power to ensure control over non-contestable transactions and then leverages its control over those transactions to demand and enforce exclusivity on contestable transactions. To overcome Visa's scale advantage, other networks must not only compete on the merits for the transactions it seeks to route, but also compensate the merchants, acquirers, and issuers for the cost of penalties imposed by Visa on all non-contestable transactions that the network is not eligible to route.

125.     Visa, through its anticompetitive actions, has made it nearly impossible for PIN networks to win additional market share. Despite the increased placement of PIN debit networks on the back of cards after the Durbin Amendment and PIN debit networks' development of new features, Visa has cut off PIN debit networks from gaining sufficient usage and acceptance on either side of the market to overcome the powerful network effects in the debit network market. Collectively, PIN networks represent approximately 11% of all debit transactions (and only 5% of CNP debit transactions). No PIN debit network has more than a single-digit share of debit transactions in the United States.

126.     Since the Durbin Amendment was enacted, smaller networks have tried to win transactions from Visa by offering lower fees, innovating, and broadening their features. But the returns to these efforts were minimal, as Visa aggressively used its monopoly power and large volume of non-contestable transactions to stifle these attempts at competition.

127.     Smaller networks lack of scale also inhibits them from offering fraud protections equivalent or better than debit network market leaders because a network needs sufficient transaction data to have acceptably robust fraud detection. Absent sufficient transaction data, PIN networks are unable to match Visa's speed and accuracy at identifying fraud.

128.     Visa is aware of these market dynamics and exploits them to limit competition. In the spring of 2023, one Visa executive observed that less than half of the debit volume in the United States was enabled by issuers to be processed as a CP PINless transaction, and "[a]s a result, many merchants have not enabled CP PINless." Acknowledging that issuer enablement influences merchants' enablement decisions, Visa feared that a large U.S. issuer enabling CP PINless could "create a tipping point . . . for more [acquirer] processors and merchants enabling and routing CP PINless." Visa feared that growing CP PINless enablement would lead to more competition from its debit network rivals.

129.     For instance, in 2023, JPMorgan Chase had Visa-branded debit cards with Mastercard's Maestro as the back-of-card network unaffiliated with Visa. Chase's contract with Visa prohibited it from adding a second back-of-card network, but Chase requested Visa waive this contractual requirement so it could add Discover's Pulse network to comply with Regulation II clarification announced in 2022. Maestro did not offer CNP PINless functionality whereas Pulse offered both CP and CNP PINless functionality. Visa executives feared that if Chase enabled Pulse on the back of its debit cards, "more

31

than 60% of the CNP volume will be priced lower than Visa by the unaffiliated networks. As that happens, more merchants [] will adopt PINless, resulting in lower transaction win rates for Visa, as well as a decline in effective transaction clearing price." Visa executives were concerned that if Chase enabled Pulse's PINless functionality, it could create a tipping point for more processors and merchants to enable and route to PINless, driving an "additional 5-10% in merchant volume to be enabled for PINless." Fearing that a PIN network would win more widespread placement and enablement on both the issuer and merchant sides of the market, Visa granted only a short-term waiver of its back-of-card network restriction clause to allow Chase to temporarily add Pulse as a second unaffiliated network the back of its debit cards, but also required that Chase enter a debit routing agreement with Visa.

### C. Visa Uses Its Monopoly Power to Prevent Innovation and New Entrants in the Debit Network Markets

130. Consumers can pay merchants directly with money in their bank accounts using means besides traditional debit transactions. One way to do this is through an alternative debit network, such as those created by fintech companies. Fintech debit networks cut debit networks like Visa out of the transaction (see Figure 3 below) and instead rely on a consumer's bank account number, rather than a debit card credential, to make real-time purchases directly from the consumer's bank account. Fintech debit networks threaten the debit network market by reducing the need for a middleman like Visa to connect issuers and acquirers. Visa's CEO has recognized that these sorts of "disruptive innovations are happening elsewhere in the world." Visa fears that potential competitors will attempt to replicate those successes in the United States.



**Figure 3**

131.    Fintech debit networks do not require a physical card and can be embedded in different types of payment solutions, such as digital wallets and other fintech products. Digital wallets are financial transaction applications, usually stored in a smartphone or computer, that can be used to complete consumer-to-merchant transactions at more than one retailer using a stored payment credential. Some digital wallets, called staged or stored value digital wallets, may enable consumers to pay for goods and services with funds in the wallet. Staged digital wallets may use funds preloaded in the wallet or may pull funds into the wallet from a linked bank account (such as a checking account, using either a debit card or a bank account number) to make transactions. In the United States, PayPal and Square's Cash App operate as staged digital wallets. A second type of digital wallet, called a pass-through wallet, transmits a consumer's payment credentials (such as a debit card account number) directly to a merchant's acquirer, which then uses those credentials to process the payment in a manner similar to a traditional debit transaction. Apple Pay and Google Pay are two popular examples of pass-through digital wallets.

132.    Over the past decade, there has been a substantial increase in the number and volume of online debit transactions. The rise of mobile payments and the COVID-19 pandemic fueled this significant change in the industry. This trend, however, has not seen a corresponding rise in the adoption of new payment methods. Rather, these new technologies and new services continue to largely run on the payment rails of the past including Visa's debit rails. This is at least in part because Visa has used its monopoly power in the debit network market to stifle potential competitors, such as fintech debit networks, from creating or enhancing payment methods that cut Visa out as an intermediary. Visa's conduct is an intentional part of its strategy to maintain its monopoly. Rather than compete with new payment technologies which could reduce or eliminate the need for Visa to act as an intermediary between both issuers and acquirers, Visa seeks to identify potential threats and enter into anticompetitive partnerships to neutralize them before they disrupt the market.

133.    At the heart of the strategy is a quid pro quo: Visa uses incentive programs to "target a small number of Visa's largest and most influential merchants for a custom incentive arrangement in return for disintermediation/non-discrimination protections, non-disparagement, and future commitments." These contracts amount to a horizontal product market division. As Visa describes it,

"These are not routing deals, these are relationship give away deals that have nothing to do with routing." In some cases, Visa "make[s] less money than [they] would in a worst case do nothing" scenario.

### 1. Visa Fears that Fintech Debit Networks Could Disrupt Its Monopoly in the Lucrative Debit Network Market

134. Since at least 2013, Visa has been concerned that fintech debit networks would displace Visa as an intermediary between both issuers and acquirers. A fintech debit network can facilitate consumer-to-merchant payments by providing end-to-end functionality equivalent to a debit network. It authorizes payments from a consumer's bank account, facilitates communications with the consumer's bank to clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution. The fintech debit networks provide additional capabilities like payment guarantee for merchants, dispute resolution and chargeback services, and fraud protections. Fintech debit networks also do not require an intermediary like Visa.

135. Visa's fear of disintermediation has been exacerbated by two developments: (1) the increasing availability of alternative payment rails that move money in real time; and (2) a growing number of fintech firms that are able to build upon these alternative payment rails to compete with Visa, particularly in CNP debit transactions. Other participants in the payments ecosystem, such as payment processors and banks also have the capability to offer fintech debit networks. As Visa recognized, real-time fintech payments "will become a viable merchant option: positioned and priced as a 'Substitute for Debit.'"

136. Visa fears that big tech companies will launch fintech debit networks that compete with Visa by displacing card-based funding options with payments directly from consumers' bank accounts. This fear was heightened with the advent of new, non-card-based payment rails which created cheaper alternatives to Visa's payments rails. For decades, payment networks have facilitated bank transfers via ACH, an interbank payment service which took several days to settle payment and even longer to make funds available in a consumer's bank account. However, new alternatives have developed and innovative fintech firms have sought to build new capabilities on both ACH and newer alternatives (known as real-time payments or RTP). For example, The Clearing House launched RTP Network, a real-time-payments network that allows immediate clearance and settlement of transactions, and the Federal Reserve

launched FedNow in 2023 to provide instant payment services between depository institutions. As faster payment alternatives emerge and banks begin to connect to them, they create the opportunity for making funds available in as close to real time as possible. To date, Visa's fears have not yet been realized as few digital wallets or other potential fintech debit networks have incorporated these new real-time payments networks into their products.

137.    Visa is concerned that digital wallets are potential competitors as they have relationships with both accountholders and merchants, making these companies uniquely positioned to build the scale necessary to succeed as a debit network. Visa knew that tech companies like PayPal, Apple, and Square had acceptance at millions of merchants and relationships with over one hundred million accountholders in the United States. Like traditional debit networks, fintech debit networks require both consumer and merchant participation. Consumers enroll in the fintech company's network, including going through the steps to link their bank accounts. Merchants also enroll in the service. For example, Visa understood that Apple Pay's broad merchant acceptance and popularity with consumers represented "an existential threat" to Visa's debit business.

### 2.    Visa Leveraged Its Debit Network Monopoly to Prevent PayPal and Others from Disintermediating Visa with Staged Digital Wallets

138.    In the 2000s and early 2010s, merchants started accepting PayPal as part of their expansion into e-commerce. Some of PayPal's customers used their Visa debit cards to pay for transactions at these merchants, including many online small- and mid-sized businesses. As a result, PayPal brought significant incremental volume to Visa, which Visa initially supported. However, in 2015, PayPal was spun-off from its parent company, eBay. At this time, Visa's view of PayPal changed. Visa viewed the newly independent company as an "innovative competitor that will be more aggressive as standalone entity." In particular, Visa was concerned about PayPal's scale and its move to encourage PayPal users to pay directly for goods and services with their bank accounts rather than with their debit or credit cards.

139.    PayPal offered a staged digital wallet with an alternative debit credential: accountholders could load funds into their PayPal wallet using their bank credentials and could make purchases using ACH. ACH transactions from PayPal's wallet included many of the same features as debit, such as fraud detection, fund guarantees, and the ability to dispute a transaction. Visa wanted discourage staged digital

wallets like this because it viewed them as an "increased disintermediation risk for issuers and Visa" which came with a "cannibalization risk." A Visa executive viewed having a commercial relationship with a company supporting a staged wallet model as a "line that must never be crossed."

140. However, in 2016, Visa blunted this threat by using its standard playbook of threatening high fees and dangling big payoffs to move PayPal transaction volume back to Visa's rails and stop PayPal from competing aggressively against Visa. At that time, even with PayPal's new strategy of encouraging consumers to pay directly with their bank accounts, a substantial number of customers had continued to make payments through PayPal using their Visa-branded debit cards. To squash PayPal's use of ACH in the staged digital wallet model, Visa used the threat of exorbitant wallet fees and high rack rates on these Visa transactions to induce PayPal to enter into a new, expansive routing agreement. PayPal had little choice but to take the deal given that it risked losing customers who used Visa on its platform if it told them they could no longer use their Visa-branded cards or would be forced to pay punitive fees.

141. At this same time, PayPal was also entering into new partnerships to bring its payments innovations to in-store merchants. However, Visa stymied these partnerships by imposing a restriction on ACH funding transactions when the PayPal customer had an existing Visa-branded card in their PayPal wallet. In 2021, Visa relaxed these restrictions but mandated information sharing so that it could monitor PayPal's product success. To this day, Visa restricts PayPal's in-store ACH funding transactions to a QR code model whereby a consumer must scan a merchant's QR code before connecting to PayPal to complete a transaction. Visa's continued restrictions on PayPal add frictions that limit the use of PayPal as an in-store alternative to Visa.

142. In 2022, PayPal and Visa entered into a new 10-year contract that limits PayPal's incentives and ability to disrupt the debit network market. This includes a debit routing commitment of 100% of its Visa-eligible volume from years four to ten, penalties for failing to convert its co- branded debit cards to Visa, a requirement to participate in certain Visa programs and services, and preservation of most of Visa's "customer choice" provisions, which gives preference to Visa payment methods over other competitive alternatives. Visa's continued dominance of the debit network market and the looming threat of Visa's exorbitant wallet fees and rack rates left PayPal with few alternatives but to compete on Visa's terms.

143.    Since 2016, Visa has threatened to impose staged digital wallet fees on other entities as well and all have signed deals with Visa rather than pay it. Visa views the fees as "a behavioral fee to reflect the propensity of SDWOs [staged digital wallet operators] to disintermediate Visa," and it will waive the fees if the wallets behave as Visa demands. In other words, Visa offers the staged digital wallets a choice: agree not to compete with Visa or pay substantial targeted fees that make the alternative networks far less profitable to operate.

144.    Visa has also entered into a series of contracts with Square that have foreclosed Square from competing aggressively against Visa and prevented Square from developing a viable alternative for consumer-to-merchant payments.

145.    In 2013, Square launched a new service, Square Cash (later called Cash App) that enabled person-to-person payments. Square sought to avoid additional Visa fees for Square Cash so that it could facilitate such payments using debit cards. Visa worried that if it did not sign a contract for Square Cash, Square was "likely to build in an ACH option." An ACH routing option would pose a threat to Visa's debit payment volume because Square could use the bank account credentials from person-to-person transactions to launch a new consumer-to-merchant debit product.

146.    Visa partnered with Square Cash and offered not to charge high rack rates for transactions using Visa's debit network. In exchange, Visa included in the agreement a right to terminate for convenience, in case Square started to compete with Visa. Visa believed it got two main benefits from the deal: (1) the debit routing commitment; and (2) "non-disintermediation, of which the major concern is ACH." After signing the first contract with Square in 2014, a Visa executive stated, "we've got Square on a short leash and our deal structure was meant to protect against disintermediation."

147.    In 2016, Square announced a new product called "Cash Drawer" that allowed users to store funds in their Square Cash account, similar to PayPal and its person-to-person payments platform Venmo. Visa was concerned that the product was a "greater disintermediation threat" that had the potential to disrupt its (and its issuer clients') profitable debit rails.

148.    As a result, Visa acted quickly to prevent disruption to its stronghold in the debit network market. Visa sent a letter of intent to terminate its contract with Square, reporting to Square that Cash Drawer was a "huge deal for us" and a "third rail" issue as "a staged wallet model was antithetical [to]

what we worked so hard to develop together with Square Cash." Faced with the risk of paying higher fees and other penalties on its Visa debit transactions, Square quickly backed down and removed the feature as a result. Visa did not terminate Square's contract.

149.     Square next launched Cash App Pay, which allows consumers to use Cash App to make purchases from merchants. This new product would trigger Visa's burdensome staged digital wallet fees, and Square asked Visa to waive those fees. Visa recognized that these threatened fees gave it "a significant lever in negotiation." As one Visa executive noted after the launch of Cash App Pay, "Square's approach is predictable and follows the disintermediation playbook to the letter." But in 2023, Visa used the leverage from the staged digital wallet fees to obtain commitments from Square that it would route 97% of its Cash App Pay transactions over Visa's rails, which would preference Visa in Cash App Pay signup flow and default settings, and would not steer customers to ACH in Cash App Pay.

**3.     Visa Pays Its Potential Debit Network Competitors, Including Apple, to Not Create or Promote Competitive Products**

150.     Visa protects against threats from potential competitors even for entities that do not operate staged digital wallets. Many of these potential competitors are also Visa customers and Visa uses its monopoly power along with the threat of imposing high fees, rack rates, and other penalties, to induce these potential competitors to enter agreements which preserve Visa's prime position in the debit network market. Each year, Visa spends a portion of its supracompetitive profits to buy off these potential competitors, like Apple, so it can continue to reap the benefits of its monopoly.

151.     Visa targets a small number of big tech merchants with custom incentive arrangements on Visa-eligible debit volume in return for commitments from them to not dislodge Visa as the middleman, and other future commitments. These contracts amount to a horizontal product market division and Visa recognizes them as such. In some cases, Visa recognizes that its choice to enter into a routing deal might not be as profitable absent the impact on competition, stating that Visa "make[s] less money than [it] would in a worst case do nothing" scenario.

152.     Visa has consistently viewed Apple as a threat, in large part due to its broad merchant acceptance and broad base of Apple Pay users. Visa feared that Apple on its own, or in partnership with

another entity, could build its own debit network independent of Visa's rails. Visa was also aware that Apple had approached a large debit issuer about building a network without Visa or Mastercard.

153.    Apple Pay is a payment system and pass-through digital wallet service. It allows users to pay at the point of sale using near-field communication. Apple Pay can be used as an alternative to debit cards and is also supported by most major debit networks. Users upload their payment information to the Apple Wallet, verify with the issuer that the information is correct, and then the information will be stored on the app until it is ready to be used for payment. It also offers better security than traditional payment methods, as Apple Pay essentially creates a token that replaces card information and it is that token, rather than the card details, that is given to merchants to process the transaction.

154.    Visa has deals with Apple in which Apple agrees that it may not develop or deploy payment functionality with the aim of competing with Visa, such as creating payment functionality that relies primarily on non-Visa payment processes or payment products. These deals also bar Apple from providing incentives that would remove Visa from its position as a middleman in a debit transaction or encourage consumers to stop using their Visa-branded cards. In return, Visa shares its monopoly profits with Apple though hefty incentive payments. Visa has provided Apple with reduced merchant fees in exchange for its commitment not to not enter into the debit network market and develop competing products. Visa payments to Apple amounted to hundreds of millions of dollars in 2023.

155.    Visa recognized internally that the benefit of Visa's terms with Apple helped ensure Apple would not enter into the market. Visa has continued to condition its partnership with Apple on Apple maintaining its status as a non-competitor to Visa. Visa views Apple as a threat in the market that could negatively affect both Visa's yields and its transaction volumes. As a result, Visa has paid Apple massive payments and financial incentives to stay out of the debit network market.

## III.    THE RELEVANT UNITED STATES DEBIT NETWORK SERVICES MARKETS

156.    Courts define a relevant market, which has both a geographic and product market dimension, to help identify the lines of commerce and areas of competition impacted by alleged anticompetitive conduct. There can be multiple relevant markets covering the same or similar products and services and markets need not have precise metes and bounds.

157. There are two relevant product markets. The market for general purpose debit network services is a distinct submarket of the market for payment services. The market for general purpose card-not-present debit network services is a distinct submarket of the market for general purpose debit network services. Several relevant factors indicate that general purpose debit network service and general purpose card-not-present debit network service are distinct products in distinct submarkets.

### A. The General Purpose Debit Network Services Market Is A Relevant Product Market

158. ***Industry and public sources recognize the general purpose debit network services market as a separate economic entity, and the general purpose debit network services product has peculiar characteristics and uses.*** Debit networks and cards are widely recognized by both industry and the public to provide a service that is separate and distinct from other payment mechanisms.

159. Industry participants acknowledge the differences between debit cards and other payment mechanisms. Visa itself separates its debit line of business from its other lines of business in its financial statements. Capital One, on its Banking 101 guide explains payment method options as follows:

**Debit card**
With a debit card, you can pay for everyday expenses with just a swipe (and usually your PIN). The money will come straight from your checking account so there's no need to carry cash if you prefer not to. Plus, if your debit card is lost or stolen, you may not be responsible for unauthorized transactions if you report it in a timely manner. Lost cash, unfortunately, is often lost for good.

**Credit card**
A credit card lets you pay for items with a line of credit. In essence, you're borrowing the money and then paying it back when the bill comes. But remember that different credit cards charge different rates of interest, so it's important to know what you're agreeing to (so you don't end up paying too much in the long run). One way to avoid paying interest is to pay your bill in full each month. You may also want to watch out for annual fees, especially if it's a card with perks such as airline miles or cash back. Shopping around for a credit card with no annual fees is always an option.

160. General purpose debit network services (or "debit network market") are payment products and services that facilitate the debit (i.e., withdrawal) of funds directly out of a consumer's bank account, often using a credential or other account number to identify the consumer. Debit networks provide products and services that are inputs to and that enable debit transactions. They compete to provide debit

network services for general purposes, meaning that their debit credentials are accepted at numerous, unrelated merchants. These networks sell services simultaneously to both issuers and acquirers, or, in the case of some alternative debit networks, accountholders and merchants. They serve as intermediaries between accountholders and merchants, operating two-sided transaction platforms that facilitate transactions between merchants and accountholders from their respective bank accounts. General purpose debit network services constitute a relevant product market under the antitrust laws.

161. Debit networks, like Visa, provide a variety of services that enable a debit transaction, and this suite of services constitutes a product that is jointly consumed by merchants, accountholders, acquirers, and the issuers. These services include the ability for the consumer or her bank to dispute and chargeback a transaction; payment guarantees for merchants; fraud protections for all parties; as well as the "rail" or methods in which the other parties communicate among each other to facilitate the transaction and transfer funds from the consumer's bank account to the merchant's account. These minimum attributes of debit networks are important to merchants, consumers, and banks alike and distinguish debit from other methods of payment. Although accountholders do not contract directly with Visa, the accountholders and their banks rely on Visa and other networks to make possible purchases from merchants.

162. Debit networks are two-sided platforms that exhibit a high degree of interdependency between accountholders and issuers on the one side and merchants and acquirers on the other. Accountholders and issuers get more value from a network that connects to more merchants, and merchants and acquirers get more value from a network that connects to more accountholders.

163. The market for general purpose debit network services includes fintech or alternative debit networks as well. These can be accepted at all merchants that participate in the network and provide payment guarantees, dispute resolution and chargeback capabilities, and fraud protection services. In a debit transaction processed by a fintech network, the consumer does not have a physical debit card and there is no issuer of a debit card, but the services provided by fintech debit networks provide the same functionality to consumers and merchants.

164. Many consumers would not find other payment services to be a suitable substitute for debit. Issuers, knowing that many of their accountholders value debit, do not consider alternative payment

41

services to be a suitable substitute for debit. Merchants do not consider other payment services to be a substitute for debit because they do not want to risk lost sales by not accepting many consumers' preferred payment method. Acquirers, knowing that their merchants value debit, do not view alternative payment services to be a suitable substitute for debit. Thus, there are no reasonable substitutes for general purpose debit network services, and a firm that was the only seller of services to facilitate debit transactions would be able to maintain prices above the level that would prevail in a competitive market.

165. As noted in Forbes, debit cards have a variety of benefits for cardholders including:
- Allow you to access your own money without carrying cash or writing checks
- Help track your spending and budgeting (since every transaction is recorded on your bank statement)
- (Some) Offer rewards or cash back for using them
- Allow you to withdraw cash from ATMs, make online purchases, and pay bills
- Require no minimum credit score, since you draw directly from your bank account
- Merchants cannot tack on surcharges like they do with credit cards

166. For consumers, debit cards enabled by general purpose debit cards are more convenient than cash or a check. Cash often requires a trip to a bank or an ATM, while writing out a check takes time at the point of purchase. Further, debit cards offer security that cash or checks do not. Consumers can easily lose or have stolen cash and checkbooks, but these means of payment do not provide the same safeguards as debit cards. The services offered by issuers often mean that a consumer is not held liable for unauthorized purchases if a consumer's card is stolen.

167. Merchants also do not find cash and check payments to be reasonably interchangeable with debit network services. The procedures and costs for accepting and processing cash and check payments differ widely from those for accepting and processing payments through a debit network.

168. General purpose credit card network services are not reasonably interchangeable with debit network services because debit payments draw from funds already in a consumer's bank account, rather than from a line of credit. The distinction between credit and debit is widely accepted in the payments industry. Visa and other card networks have different pricing for debit and credit transactions, and the Durbin Amendment's limitations of issuer transaction fees does not apply to credit. Many accountholders do not qualify for credit cards or have a strong preference for paying out of their existing

funds rather than taking on debt to make purchases using a line of credit. Given many consumers' strong preference for debit, issuers and acquirers usually cannot substitute from debit to credit.

169.     Store card network services or those for other prepaid cards are not reasonably interchangeable with debit network services. These cards are not connected to a consumer's bank account, so only funds that have been loaded on the card in advance can be spent. For that reason, Visa refers to prepaid as a "pay before" product, while debit is a "pay now" product. Visa also prices prepaid card network services differently than debit cards.

170.     Payments made through basic ACH transfers offered by The Clearing House or the Federal Reserve are often used for disbursements, paychecks, interbank settlements, and recurring fixed payments like mortgage and tuition payments. An ACH transfer is not reasonably interchangeable for most debit transactions. Absent not-yet-developed services, basic ACH transfers are inconvenient for consumers because they require a burdensome onboarding process in which the consumer must enter her bank account and routing information for each merchant, and then take steps to verify her account, which requires additional input and can take several hours or days. ACH transfers are  inconvenient for merchants because they can take two to three days to determine whether a payment is successful, and such transfers are subject to more fraud. Basic ACH transfers also lack the guarantee of payment for merchants and the dispute resolution and chargeback capabilities for consumers that debit offers.

171.     Newer interbank instant payment services, such as the Federal Reserve's FedNow and The Clearing House's RTP, may provide faster payment transfers in the future, but they would require the development of additional services from a fintech or other payment network, such as fraud detection, dispute resolution, and chargeback services, to become a viable alternative to debit.

172.     ***Unique production facilities.*** Debit networks have unique production facilities that facilitate their services. First, unlike cash or checks, debit transactions require point-of-sale technology to transmit the debit card credentials to the debit network. The technology must be sufficient to receive a response quickly, usually within minutes.

173.     Debit networks require rails to process and approve transactions. These rails are faster than ACH transactions or wires. However they are also already integrated into payment products (like debit cards) unlike RTP.

43

174.  Most transactions are transmitted to and from debit networks through an Internet connection. Debit networks must therefore provide both security (e.g., authentication) and encryption for the transactions they facilitate over the internet.

175.  Debit networks must also maintain technology, infrastructure, and agreements to facilitate contactless payments, such as through Apple Pay and/or using a near-field communications ("NFC") reader.

176.  *Distinct customers/consumers.* Debit networks have distinct customers. Specifically, their customers are debit cardholders that enter into transactions and the merchants that accept those debit cards.

177.  Debit cards are popular with cardholders from lower income households and younger people as well. Consumers without significant credit history or with bad credit may not be eligible for a credit card or may have a credit card with a smaller spending limit.

178.  *Distinct prices and sensitivity to price changes.* Debit networks charge prices distinct from other payment systems. Specifically, debit networks charge fees, including interchange fees (which the Federal Reserve caps at 0.05% plus 21 cents for banks that hold more than $10 billion in assets) and additional mark-up fees.

179.  The fees paid to debit networks are ultimately paid by cardholders that make purchases, as merchants include the fees in the price of their goods.

180.  *Specialized vendors.* Debit networks utilize specialized vendors, such as third-party security providers, acquirers, providers of point-of-sale systems, and issuers that use debit networks for their debit cards.

**B.  The General Purpose Card-Not-Present Debit Network Services Market Is A Relevant Product Market**

181.  *Industry and public sources recognize the general purpose card-not-present debit network services market as a separate economic entity, and the general purpose card-not-present debit network services product has peculiar characteristics and uses.* Industry participants, including Visa, recognize subcategories of debit network services which exist in narrower submarkets of the larger

44

market of debit network services. For example, Square provides resources explaining card-not-present transactions for businesses using its payment products:

> A card-not-present (CNP) transaction occurs when neither the cardholder nor the credit card are physically present at the time of the transaction. It's most common for remote orders — over the phone or by fax, internet, or mail.
>
> A transaction is only considered "card present" if payment details are captured in person at the time of the sale. This occurs when cards are physically swiped, tapped, or dipped through a reader or if an EMV chip is processed.

182.  Checkout.com, which offers payment processing solutions, also recognizes the differences between card-present and card-not-present transactions:

> What is the difference between card-present and card-not-present?
>
> Beyond just the physical presence of the credit card, a transaction is categorized as "card-present" only when electronic data is captured at the point of sale. This can be done by swiping a magnetic strip card, inserting an EMV chip card, or tapping an NFC/contactless digital wallet linked to a stored card, like using Apple Pay on a smartphone.
>
> All other payment methods fall under the category of "card-not-present" transactions, even if the customer physically presents the card during the transaction.
>
> Understanding whether transactions are categorized as card-present or card-not-present is important because the way the transaction is conducted can impact your processing costs, while it can influence your liability for chargebacks.

183.  Card-not-present transactions also have unique characteristics and uses. They include online shopping, manually entered orders over the phone, reoccurring payments or subscription billing, payment applications not involving a card reader and electronic invoicing. Typically, neither the debit card nor the cardholder is physically present during the transaction.

184.  ***Unique production facilities.*** Card-not-present transactions are processed similarly to general debit transaction, but require the manual entry of the card credentials into the payment system, rather than a swipe or tap.

***Distinct customers/consumers.*** Few consumers, issuers, merchants, or acquirers would find other payment services to be a suitable substitute for card-not-present debit network services. In situations where card-not-present transaction are needed there are few available forms of payment (for example,

cash is not an option when purchasing something online). There is not a reasonable substitute for card-not-present debit network services.

185. About one-third of debit transaction in 2021 occurred remotely according to a study by PULSE. This includes services such as peer to peer payments using debit cards, everyday purchases, and paying bills.

186. ***Distinct prices and sensitivity to price changes.*** Card-present transactions typically have lower rates because the physical card presence adds security and lowers the risk of fraud. Card-not-present transactions generally have higher fees due to the higher risk of fraud.

## C. The United States Is a Relevant Geographic Market

187. The relevant geographic market in this case is the United States. This market is distinct because anti-money laundering, consumer protection, interchange fee, and banking laws are distinct within the United States.

188. Payment networks within the United States also facilitate transactions in the U.S. dollar. International transactions may require a currency exchange by the issuer.

189. Visa organizes its U.S. debit business at the national level, as demonstrated by its separate rules governing merchant acceptance in the United States and its separate pricing of debit, including CNP debit, to merchants, acquirers, and issuers in the United States. The relevant parties to a debit transaction—consumers, issuers, acquirers, and merchants—could not practicably turn to debit network services offered elsewhere as alternatives. Therefore, a firm that was the only seller of general purpose debit network services in the United States would be able to maintain prices above the level that would prevail in a competitive market.

190. Moreover, U.S. issuers in some cases block Visa and Mastercard debit card transactions in countries with high levels of fraud or that are fraught with regulatory constraints, including China, Syria, Iran, North Korea, Romania, Ukraine, Saudi Arabia, and South Africa.

## IV. VISA HAS MONOPOLY POWER IN THE RELEVANT UNITED STATES DEBIT NETWORK SERVICES MARKETS

191. Visa is a monopolist in the general purpose debit network services and general purpose card-not-present debit network services markets in the United States, with market shares of at least 60%

and 65% of payment volume, respectively. Mastercard is the second largest debit network in the United States and processes less than 25% of debit transactions in the relevant markets. No other competitor has more than a single digit share of debit transactions in the markets.

192.    Visa has monopoly power in the relevant markets because it has the power to control prices and exclude competition in the markets.

193.    Visa has been able to maintain monopoly prices as reflected in its high profit margins. Visa has an operating margin of 83% in North America, of which its U.S. debit network business is the largest contributor. These margins are well above Visa's reported high margins globally, since it became a public company in 2007, and much higher than the vast majority of public companies

194.    Visa has been able to successfully restrain competition and exclude competitors from the general purpose debit network services market and general purpose card-not-present debit network services market, as reflected in its durable high market shares which persist in the face of regulatory changes.

195.    After a brief adjustment period when the Durbin Amendment took effect in 2012, Visa's market shares have increased over the last decade. Immediately after the Durbin Amendment went into effect, Visa's share dropped from approximately 63% of debit payment volume in 2011 to approximately 56% in 2012. But Visa took steps to insulate its debit business from competition and began a program of signing contracts with merchants and acquirers to ensure that all or nearly all their eligible debit volume was routed to Visa. Within a few years, Visa was able to regain and strengthen its general purpose debit network services market monopoly. In subsequent years, it has repeated this playbook in response to each new threat to its debit network monopoly.

196.    Even with the recent Regulation II clarification requiring issuers to enable at least one network unaffiliated with the front-of-card network for CNP debit transactions, there has been no meaningful impact to Visa's market share in either market.

197.    Several additional factors show Visa has monopoly power in these markets. Unlike smaller PIN networks, Visa is accepted by nearly all U.S. merchants that accept debit as a form of payment—regardless of whether the merchant derives most of its revenue from CP or CNP transactions. Merchants view Visa as a must-have, accepting this network, along with Mastercard, allows merchants to maximize

47

their ability to make a sale regardless of which debit card their customers present. This increases Visa's power over merchants. This is especially true for merchants in competitive industries who cannot refuse to accept Visa's debit network when Visa charges them higher prices or gives them worse terms than rival debit networks.

198. In addition, debit networks and potential market entrants face barriers to entry and expansion in the form of regulation and brand recognition. Merchants and acquirers are more likely to incur the costs of enabling and maintaining compliance with networks that have sufficient volume to make the expense and effort worth it. Similarly, issuers are more likely to enable networks if those networks are widely accepted by merchants. Because the market is two-sided, it is difficult to obtain widespread enablement without widespread acceptance on both sides of the market. This creates a feedback loop, known as network effects, that creates a particularly significant barrier to entry and expansion.

199. Banks generally only issue debit cards under a single front-of-card network, entering long-term contracts usually with either Visa or Mastercard and infrequently switch front-of-card networks, in part because of the cost and consumer disruption associated with switching. These switching costs further protect Visa's dominance on the front-of-card by inhibiting competitors growth and the potential for other front-of-card competitors to enter the market or expand.

200. Visa recognizes and exploits these barriers to entry, including switching costs and network effects, to protect itself from competition from rival networks and potential competitors that may break Visa's monopoly on the general purpose debit network services market. For example, to prevent PIN networks from gaining scale, in 2023, Visa informed issuers they may be required to pay monetary penalties if they enabled new features of PIN networks that result in the loss of Visa debit network volume. This is at the same time Regulation II was released and mandated that issuers enable at least two unaffiliated networks for CNP transactions. Previously, many issuers had relied exclusively on the front-of-card networks (usually Visa or Mastercard) to process CNP transactions. Visa implemented these penalties seemingly because it was worried that merchants and acquirers would finally enable rival debit networks' PINless capabilities.

201. To further slow the enablement of PINless capabilities by merchants and acquirers and neutralize the potential threat of these technologies to its monopoly, Visa began encouraging issuers to

turn off PINless capabilities for CP debit transactions. Visa threatened that enabling CP PINless capabilities may result in the issuer paying higher fees and other penalties. These penalties essentially would serve as a price increase to issuers, one which they could not easily avoid due to the costs of switching networks. Visa's actions in deterring issuers from enabling CP PINless technology helps Visa maintain its set of non-contestable transactions, which it can in turn utilize to create penalties for disloyalty.

202.     Because of Visa's monopoly power, it is able to set prices without regard to its costs. Visa is also able to price discriminate between various industry groups in a way that is unrelated to Visa's costs in providing its services to those industry groups. It also has successfully imposed new, unfavorable pricing structures without losing debit volume. For example, in 2012, Visa implemented its new monthly FANF across all merchants and acquirers. More recently, in October 2023, Visa introduced a new mandatory fee which it refers to as the "Digital Commerce Service Fee." This fee bundles several previously optional "value-added services" fees charged to CNP transactions. Visa anticipates that the new mandatory fee will generate almost five-times the net revenue than the previously optional fees. Visa is able to impose these new fees on merchants through their acquirers knowing that it will not lose transactions.

## V.     THE DEBIT NETWORK BARRIER TO ENTRY

203.     The U.S. debit network services markets are protected by a powerful barrier to entry, which arises from a series of network effects and feedback loops. This barrier to entry is called the Debit Network Barrier to Entry ("DNBE").

204.     Debit card holders will not use a debit card that is not generally accepted by merchants. Issuers therefore are more likely to enable networks if those networks are widely accepted at merchants. Thus, the more widespread the acceptance of a debit network, the more valuable the debit network becomes. In other words, there is a direct network effect that results from a critical mass of merchants accepting a debit network. On the other side of the market, merchants and acquirers incur the costs when enabling and maintaining compliance with networks. They are unlikely to do so unless those networks have sufficient volume to make the expense and effort worth it. Thus, debit networks can obtain transaction volume, and fees, from acquirers and issuers only if their debit network is accepted by a

49

critical mass of merchants and enabled on a critical mass of debit cards. Without widespread acceptance, a debit network is not viable and cannot charge fees.

205.    To create a new debit network, an entrant must have access to a large number of issuers in order to incentivize merchants and acquirers to accept cards using the entrant's network. The result is a self-reinforcing feedback loop that creates a powerful barrier to entry surrounding the general purpose debit network services market and the general purpose card-not-present debit network services market.

206.    The DNBE can be disrupted only with the existence of a viable entrant at scale in the general purpose debit network services market and general purpose card-not-present debit network services market.

## VI.    ANTICOMPETITIVE EFFECTS

207.    Visa has maintained its dominant position in the markets for years through actions that harm competition. Its web of exclusionary and anticompetitive agreements and control over non-contestable transactions illegally restrain competition.

208.    Absent Visa's exclusionary and anticompetitive agreements with merchants, acquirers, and issuers, Visa's back-of-card competitors (i.e., PIN networks, including Mastercard's Maestro), would have the chance to gain the scale needed to compete effectively with Visa. Visa has also employed exclusionary and anticompetitive contracts to neutralize threats from fintech firms who could be potential competitors. Without these anticompetitive agreements with firms on the precipice of entry into the markets, these fintech firms would have greater incentive to innovate and compete directly with Visa, and Visa would have an incentive to respond, offering consumers and businesses new choices and better features. In a debit network market where Visa had not entered into a web of exclusionary and anticompetitive agreements, competition from current and potential rivals would increase and lead to lower fees, better service, and greater innovation.

209.    Visa's anticompetitive conduct is both facilitated and reflected by the substantial foreclosure of competition it has achieved in the relevant markets. Visa itself calculated that by the end of 2022 at least 75% of all its debit volume—and 80% of its CNP debit volume—were insulated from competition by its rivals through its contracts. Looking beyond the debit volume Visa received, its

merchant and acquirer routing contracts alone foreclose at least 45% of all debit transactions in the United States, and an even higher fraction of CNP debit transactions.

210. Visa's exclusionary and anticompetitive conduct creates a cycle that further insulates it from competition. By locking up debit volume through agreements that constrain competition on both sides of the market, Visa has deprived rivals and would-be rivals of the scale they need to offer effectively compete in the market. This means that rival networks have limited or no ability to compete on price and quality (e.g., fraud detection). Visa's agreements limit how much additional volume rival networks can win if they lower prices or invest in new benefits or features, = therefore also reducing the incentives for them to do so. Weakening its rivals in these ways not only protects Visa from competition for transactions that should be subject to competition today, but also reduces the chances that those rivals can offer the features and services necessary to erode Visa's advantage on non-contestable transactions, such as by further developing PINless routing technology.

211. Visa's exclusionary and anticompetitive conduct has stopped beneficial innovation in other ways. For more than a decade, Visa has sought to delay or deter the development of fintech network services that would offer consumers new ways to pay merchants directly from bank accounts. This has delayed or deterred the introduction of features such as digital wallets or other features that would increase convenience, security, and build closer relationships between merchants and consumers. Visa's efforts have not only reduced innovation from other companies that would benefit consumers, but also its own incentives to innovate. Visa has admitted that it has not materially invested in innovation in the last decade other than its tokenization efforts.

212. Since the enactment of the Durbin Amendment, PIN networks have attempted gain market share from Visa. For example, Mastercard launched a PINless program for Maestro which targeted debit cards utilizing Visa's front-of-card debit network. But Visa repeatedly leveraged its massive scale and immense volume of non-contestable transactions to penalize merchants, acquirers, and issuers who were disloyal. Visa continues to maintain its large market share despite other networks generally offering lower prices or more technologically advanced options.

213. If Visa were to compete in a market with vigorous competition, its prices and investment in innovation and benefits for customers would have to improve. But Visa has historically worked hard

51

to avoid that sort of vigorous competition. Visa's practice is to insulate its debit network from competition whenever it can; sometimes by foreclosing rivals from being able to meaningfully compete for significant shares of the market and sometimes by reducing incentives to compete via imposing fees or providing financial benefits. Visa's conduct further suppresses incentives for itself and its current and potential rivals to compete and innovate.

214. Visa intended to capture a large amount of contestable transactions through anticompetitive means; preserve and expand its volume of non-contestable transactions; block or discourage competitive threats from current or would-be rivals; and benefit from its unlawfully maintained monopoly as a result.

## VII. NO COUNTERVAILING FACTORS

215. There are no valid, procompetitive benefits to Visa's exclusionary conduct that outweigh its anticompetitive effects or which cannot be obtained through less restrictive means. Visa's anticompetitive agreements and conduct are not reasonably necessary to protect Visa's technology, incentivize customer growth, prevent free riding, or achieve any other benefit. Visa can achieve any legitimate, procompetitive objectives without imposing the anticompetitive terms challenged in this case, or those benefits could be achieved through less restrictive means. Moreover, Visa's agreements with current and potential direct competitors are not ancillary to its vertical relationship. Rather, they are *per se* illegal horizontal, market division agreements between direct, horizontal competitors.

## CLASS ACTION ALLEGATIONS

216. The Class's claims all derive directly from Defendant's course of conduct. Defendant has engaged in uniform and standardized conduct toward the Class.

217. Defendant did not materially differentiate in its actions or inactions toward members of the Class. The objective facts on these subjects are the same for all Class members.

218. Within the Claim for Relief asserted by the Class, the same legal standards govern. Accordingly, Plaintiff brings this lawsuit as a class action on his own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2).

219.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

### The Class

220.    Plaintiff brings this action and seek to certify and maintain it as a class action under Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and a Class defined as follows:

> All persons (including entities and corporations) in the United States who directly or indirectly paid interchange fees as debit card holders from October 22, 2020, through the present.

221.    Excluded from the Class are Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

### Numerosity and Ascertainability

222.    The Class in this action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). Millions of persons, entities, and/or companies nationwide have been harmed by Visa's anticompetitive conduct through a reduction in innovation, less consumer choice, reduced quality, and higher fees. Individual joinder of all Class members is impracticable.

223.    The Class is ascertainable because its members can be readily identified using Visa's records, records of issuers and acquirers, or through economic analysis of the portion of the passed-on fees paid by debit card holders as part of each purchase.

224.    Plaintiff anticipates providing appropriate notice to the certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after the class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

### Common Issues

225.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(2) because questions of law and fact that have common answers that are the same for the Class exist.

226.    Common issues include, without limitation, the following questions of law and fact for the Class:

a. Whether Visa's agreements with competitors and potential competitors violate Section 1 of the Sherman Act;

b. Whether Visa has conspired to monopolize the general purpose debit network services market in violation of Section 2 of the Sherman Act;

c. Whether Visa has conspired to monopolize the general purpose card-not-present debit network services market in violation of Section 2 of the Sherman Act;

d. Whether Visa's agreements with competitors and potential competitors result in harm to competition in the general purpose debit network services market that are outweighed by any procompetitive benefits;

e. Whether Visa's agreements with competitors and potential competitors result in harm to competition in the general purpose card-not-present debit network services market that are outweighed by any procompetitive benefits;

f. Whether Visa's agreements with competitors and potential competitors are *per se* unlawful, or in the alternative whether they violate the rule of reason because the agreement lacks procompetitive benefits, or the anticompetitive effects of the agreement outweigh their pro-competitive benefits;

g. Whether Visa's agreements with competitors and potential competitors violate the rule of reason;

h. Whether the members of the Class are entitled to injunctive relief;

i. Whether Visa has unlawfully and anticompetitively reinforced and strengthened barriers to entry surrounding the general purpose debit network services market.

**Typicality**

227.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because for the proposed Class, the identified Plaintiff's claims are typical of the claims of other Class members and arise from Defendant's same course of conduct. The relief the Class's named Plaintiff seeks is typical of the relief sought by the absent Class members.

**Adequate Representation**

228.     Plaintiff will fairly and adequately represent and protect the interest of the Class. Plaintiff has retained counsel with substantial experience in prosecuting antitrust and consumer class actions.

229.     Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have interests adverse to those of the Class.

**Indivisible Remedy**

230.     The equitable and injunctive relief sought is an indivisible remedy, as a single injunction or declaratory judgment would provide relief to each member of the class.

**REALLEGATION AND INCORPORATION BY REFERENCE**

231.     Plaintiff realleges and incorporates by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Class.

**CLAIMS FOR RELIEF**

**COUNT I**
**Section 1 of the Sherman Act – Unlawful Agreements Not to Compete**
**(Agreements with Actual and Potential Competitors)**

232.     Visa's agreements with competitors and potential competitors not to compete in two relevant markets related to debit transactions in the United States—(1) the market for general purpose card-not-present debit network services and (2) the market for general purpose debit network services—unreasonably restrain trade and violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

233.     Visa has market power in both relevant markets.

234.     Visa's agreements pay competitors and potential competitors not to compete in the relevant markets and not to develop alternatives to debit networks or adopt new technologies that may disrupt traditional debit network structures. These agreements reduce or eliminate competition from existing or potential rivals who would challenge Visa's dominance and therefore impede competition and unreasonably restrain trade in each relevant market. These agreements affect the relevant markets by raising barriers to competition by current and potential competitors, imposing supracompetitive prices,

stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

235.     These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

## COUNT II
### Section 1 of the Sherman Act – Unlawful Agreements that Restrain Trade
### (Agreements with Merchants, Issuers, and Acquirers)

236.     Visa's agreements with merchants, issuers, and acquirers unreasonably restrain trade, in violation of Section 1 of the Sherman Act, in two relevant markets related to debit transactions in the United States—(1) the market for general purpose card-not-present debit network services and (2) the market for general purpose debit network services—including by failing the Rule of Reason.

237.     Visa has market power in each relevant market.

238.     These agreements contain penalties, cliff pricing terms, volume commitments, and other terms that unreasonably restrain competition, including by foreclosing a substantial share of the relevant market. These agreements unreasonably restrain trade in each relevant market and impede competition from existing or potential rivals to challenge Visa's dominance. The effects of these agreements include raising barriers to competition for current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, reducing output or other services, and slowing innovation.

239.     These agreements are not reasonably necessary to accomplish any procompetitive goals. Any procompetitive benefits are outweighed by anticompetitive harm, and there are less restrictive alternatives by which Visa would be able to reasonably achieve any procompetitive goals.

## COUNT III
### Monopolization of the General Purpose Debit Network Services Market and the
### General Purpose Card-Not-Present Debit Network Services Market
### Section 2 of the Sherman Act

240.     Visa has monopolized, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the markets for general purpose debit network services and general purpose card-not-present debit network services related to debit transactions in the United States.

241. Visa has monopoly power in both relevant markets.

242. Visa has willfully and unlawfully maintained its monopoly in the relevant markets through an exclusionary course of conduct and anticompetitive acts described in this Complaint. Each of Visa's actions individually and collectively increased, maintained, or protected its monopoly in the relevant markets.

243. While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in the relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

244. Visa's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Visa's anticompetitive and unlawful conduct.

### COUNT IV
### Attempted Monopolization of the General Purpose Debit Network Services Market and the General Purpose Card-Not-Present Debit Network Services Market
### Section 2 of the Sherman Act

245. Visa has attempted to monopolize, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the markets for general purpose debit network services and general purpose card-not-present debit network services related to debit transactions in the United States.

246. Visa has monopoly power, or alternatively has a dangerous probability of obtaining monopoly power, in both relevant markets.

247. Visa has attempted to monopolize the relevant markets through an exclusionary course of conduct and anticompetitive acts described in this Complaint. While each of Visa's acts is anticompetitive in its own right, Visa's interrelated and interdependent actions have had a cumulative and self-reinforcing effect that has harmed competition and the competitive process in the relevant market, including, as compared to a more competitive environment, raising barriers to competition by other current and potential competitors, imposing supracompetitive prices, stabilizing prices, depressing price competition, restricting output or other services, and slowing innovation.

248. In undertaking this course of conduct, Visa has acted with specific intent to monopolize each relevant market in the United States. Each of Visa's actions individually and collectively were specifically intended to monopolize each relevant market in the United States by destroying effective competition in that markets through the acts alleged in this Complaint. There is a dangerous probability that, unless restrained, Visa will succeed in monopolizing each relevant market in the United States in violation of Section 2 of the Sherman Act.

249. Visa's exclusionary conduct lacks procompetitive justifications that offset the harm caused by Visa's anticompetitive and unlawful conduct.

### COUNT V
### Massachusetts Consumer Protection Act – Mass. Gen. Laws ch. 93a § 1, *et seq.*
### (On behalf of Named Plaintiff and Massachusetts Class Members)

250. Massachusetts Visa debit cardholder Plaintiff Richard Pantano brings claims under the Massachusetts Consumer Protection Act on behalf of himself and the Massachusetts class members.

251. By reason of the conduct alleged in this Complaint, including Visa's violation of federal antitrust laws, Visa has violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 2, *et seq.*

252. Massachusetts Visa debit cardholder Plaintiff Pantano and the Massachusetts class members acquired and used their Visa debit cards within the Commonwealth of Massachusetts during the Class Period. But for Visa's anticompetitive conduct set forth in this Complaint, the prices Plaintiff Pantano and the Massachusetts class members paid for products with their Visa debit cards would have been lower, in an amount to be determined at trial.

253. Visa established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the general purpose debit network services market and general purpose card-not-present debit network services market, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in general purpose debit network services market and general purpose card-not-present debit network services market, including for Visa debit cards.

254. Visa's conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

255. Visa's unlawful conduct substantially affected Massachusetts's trade and commerce.

256. As a direct and proximate cause of Visa's unlawful conduct, Plaintiff Pantano and the Massachusetts class members have been injured in their business or property and are threatened with further injury.

257. By reason of the foregoing, Plaintiff Pantano and the Massachusetts class members are entitled to seek all forms of relief, including treble damages and reasonable attorneys' fees and costs under Massachusetts General Laws ch. 93A, § 9.

258. The demand letter requirement under Massachusetts General Laws ch. 93A, § 9 does not apply to Visa because, based on counsel's investigation, Visa does not have a place of business or assets within Massachusetts.

259. In conjunction with the filing of this Complaint, Plaintiff Pantano has served a copy on the Massachusetts Attorney General in accordance with Massachusetts General Laws ch. 93A, § 10. Plaintiff Pantano will file proof of such service with the Court.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individual and on behalf of members of the Proposed Class, respectfully requests that the Court enter judgment in his favor and against Visa as follows:

A. Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiff as representative of the Class;

B. Enter a judgment against Visa in favor of Plaintiff and the Class;

C. Grant permanent injunctive relief to remedy the ongoing effects of Visa's unlawful and anticompetitive conduct, including its unlawful agreements;

D. Award Plaintiff and the Class actual and/or trebled damages;

E. Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law;

F. Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable as a matter of right.

Dated: October 22, 2024                    Respectfully submitted,

  */s/ Brian J. Dunne*                        */s/ Yavar Bathaee*
Brian J. Dunne (CA 275689)              Yavar Bathaee (CA 282388)
bdunne@bathaeedunne.com                 yavar@bathaeedunne.com
Edward M. Grauman (*p.h.v. to be sought*)  Andrew C. Wolinsky (CA 345965)
egrauman@bathaeedunne.com               awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**                   **BATHAEE DUNNE LLP**
901 South Mopac Expressway              445 Park Avenue, 9th Floor
Barton Oaks Plaza I, Suite 300          New York, NY 10022
Austin, TX 78746                        Tel.: (332) 322-8835
Tel.: (213) 462-2772

                                        Allison Watson (CA 328596)
                                        awatson@bathaeedunne.com
                                        **BATHAEE DUNNE LLP**
                                        3420 Bristol Street, Suite 600
                                        Costa Mesa, CA 92626
                                        Tel: (213) 458-7075

                                        *Attorneys for Plaintiff and the Proposed Class*